**ODYSSEY PARTNERS, L.P., Odyssey–Abco Limited Partnership, Prudential Securities, Inc., The Prudential Insurance Company of America, and W.R. Huff Asset Management Co., L.L.C., Plaintiffs,**

v.

**FLEMING COMPANIES, INC. William M. Lawson, Jr., Thomas W. Field, Jr., Edward G. Hill, Jr., and R. Randolph Devening, Defendants.**

Civil Action No. 14770.

Court of Chancery of Delaware,
New Castle County.

Submitted: Dec. 1, 1998.
Resubmitted: April 19, 1999.
Decided: May 13, 1999.

Richard D. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; of Counsel: Allan E. Ceran, of Rodi, Pollock, Pettker, Galbraith & Cahill, Los Angeles, California, Attorneys for Plaintiffs.

Stephen E. Herrmann, and Svrinivas M. Raju, of Richards, Layton & Finger, Wilmington, Delaware; of Counsel: John M. Mee, Esquire and Louis J. Price, of McAfee & Taft, Oklahoma City, Oklahoma, Attorneys for Defendants.

## OPINION

LAMB, Vice Chancellor.

## I. INTRODUCTION

This action arises out of a foreclosure sale at which defendant Fleming Co., Inc. ("Fleming") acquired 100% of the stock of ABCO Markets Inc. ("ABCO Markets"), the operating subsidiary of ABCO Holding, Inc. ("ABCO"). At the time of the sale, Fleming was both the majority stockholder and sole secured creditor of ABCO, that debt being secured by a pledge of essentially all ABCO's assets, including the ABCO Markets stock. Several persons appeared at the foreclosure sale, but Flem-

ing made the only bid, equal to the value of the debt foreclosed. By a collateral undertaking with the ABCO board of directors made earlier, Fleming also undertook to pay all of ABCO's unsecured creditors in full. As a consequence of these transactions, ABCO was left a shell corporation without material assets, liabilities or operations. Its common stock became and remains valueless.

The plaintiffs were and are minority stockholders of ABCO. They filed suit individually, and not derivatively on behalf of ABCO, alleging breaches of fiduciary duties by Fleming and four former members of ABCO's board of directors. ABCO's certificate of incorporation contains a provision (Article Eighth) barring the plaintiffs from recovering monetary damages from the director defendants to the extent permitted by 8 *Del. C.* § 102(b)(7). In view of this provision, plaintiffs charge that Fleming engaged in a course of unfair dealing, accomplished by an improper exercise of control over ABCO and a majority of its directors, that culminated in the foreclosure transaction. Plaintiffs seek recovery of the value of their shares at the time of the foreclosure, claimed to have been approximately $6.1 million, plus interest. Fleming and ABCO Holding are Delaware corporations. ABCO Markets is an Arizona corporation.

## A. Factual History

### 1. The Parties

Plaintiffs are Odyssey Partners, L.P. ("Odyssey Partners"), Odyssey–ABCO Limited Partnership ("Odyssey–ABCO LP"), Prudential Securities, Inc., The Prudential Insurance Company of America (collectively, "Prudential") and W.R. Huff Asset Management Co., L.L.C. ("Huff"), minority stockholders of ABCO Holding. Together, they owned 289,765 shares (or roughly 27%) of the outstanding ABCO common stock (1,067,000).

ABCO Markets is an Arizona corporation formed in 1984 for the purpose of acquiring 33 stores purchased from a chain formerly known as Alpha Beta. In 1988, ABCO Markets acquired 38 additional stores from Lucky Stores, Inc., thus increasing its holdings to over 70 stores and making it one of the largest chains in the Phoenix and Tucson, Arizona areas. The ABCO Markets stores were operated under the trade names ABCO Foods and Desert Markets. From its formation until 1992, ABCO Markets was owned directly or indirectly through a holding company, O.P. Markets, Inc. ("O.P.Markets"), an affiliate of Odyssey Partners, and related persons. From 1992 until January 9, 1996, the entirety of ABCO Market's stock was held by ABCO Holding, a Delaware corporation. In this opinion, where necessary for clarity, I will distinguish between "ABCO Markets" and "ABCO Holding." Otherwise I will refer generally to "ABCO" without distinction between the corporate entities.

Fleming, a Delaware corporation, is a large food wholesaler headquartered in Oklahoma City, Oklahoma. Fleming operates in the Phoenix market and, in 1985, entered into an agreement with ABCO to supply grocery products for sale in its stores (the "Supply Agreement").

The remaining defendants are former members of ABCO's board of directors: R. Randolph Devening ("Devening"), Thomas W. Field, Jr. ("Field"), Edward G. Hill, Jr. ("Hill") and William M. Lawson, Jr. ("Lawson").

### a. R. Randolph Devening

Devening's involvement with ABCO began in 1989 when, as Fleming's chief financial officer ("CFO"), he began to oversee Fleming's business interests in ABCO. Devening served as an ABCO director at all times relevant to this action, first as a Fleming designee and, beginning in 1994, as an independent director.

Devening entered the grocery business in 1970, joining Fleming in 1979 as its senior vice president of finance and administration. In 1987, he left Fleming to be-

come vice president and CFO of Genentech, Inc., but returned to Fleming in 1989 as executive vice president and CFO. He remained in those positions until 1993 when he was promoted to vice chairman and CFO. In July 1994, he left Fleming to become chairman, president and chief executive officer ("CEO") of FoodBrands America, Inc.[1]

In connection with his 1994 resignation, Devening entered into a consulting agreement with Fleming, the purpose of which was to fulfill the age and length of service requirements for an enhanced retirement package. Devening testified that during the term of this consulting agreement, he received two annual payments of $1,000 and was never called upon by Fleming to perform any services. Since 1994, Devening has earned a very high level of compensation at FoodBrands.

In addition to his positions at FoodBrands, Devening currently is or has been a director on the boards of Hussmann International, Inc., Hancock Fabrics, Inc., the Fred Jones Automotive Group, Arkwright Mutual Insurance Company, ENTEX Information Services, Inc., Del Monte Foods Corporation, Autocraft Industries, Inc., House of Vision, Inc. and the Liberty Bank & Trust Company of Oklahoma City.

### b. Thomas W. Field, Jr.

Field is a graduate of Stanford University. He entered the grocery business in 1953 as a store clerk with Alpha Beta Markets ("Alpha Beta"). By 1976, he had risen to the position of president and CEO. Alpha Beta was purchased by American Stores and in 1981 Field became president and chief operating officer ("COO") of the resulting enterprise, managing 1200 stores with combined sales of approximately $9 billion. Field oversaw the 1984 sale of the Alpha Beta stores (to ABCO), after which he left American Stores to become president of McKesson Corporation, a large drugstore wholesaler and, eventually, became its chairman of the board and CEO. In 1989, Field left McKesson to start Field & Associates, a management consulting firm in the grocery and drugstore businesses.

Fleming hired Field in 1991 as a consultant and appointed him to ABCO's board of directors in 1992. Shortly thereafter, Field was unanimously elected chairman of the board and, a year later, CEO. Fleming paid Field a consulting fee until 1992, when ABCO began paying his salary ($273,000 plus expenses). At all relevant times, Fleming also paid Field an annual director's fee of $24,000 for his service as one of Fleming's two board designees. In addition to ABCO, Field has served as a director of Campbell Soup Co., Maxicare Health Plans Inc., Stater Bros. Markets, American Stores, McKesson Corporation, Armor All, PSC Inc. and Bromer Inc.

### c. Edward G. Hill, Jr.

Hill worked in the retail grocery business through high school, college and graduate school. After serving in the armed forces, he joined Alpha Beta and in 1979, moved to Phoenix to manage stores in that area. In 1984, acting in conjunction with Odyssey Partners and others, Hill purchased the 33 Alpha Beta stores located in Arizona. ABCO Markets was formed as a wholly owned subsidiary of O.P. Markets. The equity interests in the deal were split up between Hill (12%), other members of management (3%) and Odyssey Partners (85%). From ABCO's formation in 1984 until the 1996 foreclosure, Hill served as ABCO's president and COO.

### d. William M. Lawson, Jr.

Lawson, a lawyer, joined Fleming in 1994 as a senior vice president of corporate development and international operations. His responsibilities included membership on Fleming's strategic issues

---

1. A FoodBrands division is supplied, in part, by Fleming, although sales from the use of Fleming products account for less than 2% of FoodBrands' total sales.

committee ("SIC") and service as chairperson of Fleming's business development committee. He also worked on international investments and on special projects as requested by Robert E. Stauth ("Stauth"), Fleming's CEO. At Stauth's request, Lawson joined ABCO's board of directors in 1994, replacing Devening as a Fleming designee. He had no prior experience as a director.

### 2. The Lucky Stores Acquisition

ABCO financed its 1988 acquisition of the 38 Lucky Stores through the issuance of $62,500,000 in principal amount of $14\frac{3}{8}\%$ Senior Subordinated Notes ("Notes"), due in 1998, to various investors (the "Noteholders"), including all but one of the plaintiffs. Additional financing was obtained from Fleming, which loaned O.P. Markets approximately $15 million and through a credit agreement with Manufacturers Hanover Trust Company (later "Chemical Bank") providing for term and revolving credit loans. The Chemical Bank financing was secured by a first priority interest in substantially all of the assets of ABCO and its real estate subsidiary, ABCO Realty Corp.

### 3. The 1991 Restructuring

In February 1991, in response to an increasingly difficult competitive environment, the ABCO directors determined that it was necessary to restructure ABCO's capital and reduce its interest expense in order to avoid a bankruptcy filing ("1991 Restructuring"). Devening spearheaded the undertaking, leading a team consisting of Field and others, including representatives of Odyssey Partners. The team developed a strategy to achieve a financial restructuring to relieve ABCO's mounting debt problems and provide the initial capital needed to develop a new, higher margin, store concept known as Desert Market.

The restructuring plan devised by Devening and the others involved several elements, as follows: (1) the extension of trade credit (by Fleming to ABCO) from seven days to 28 days from the date of delivery of the products; (2) an exchange of $12 million of the $15 million loaned by Fleming to ABCO from debt to ABCO preferred stock; (3) a $20.5 million reduction of ABCO's outstanding debt by exchanging the outstanding Notes for ABCO preferred stock and (4) the execution of a Stockholders Agreement granting Fleming the right to designate two members to O.P. Markets' board of directors. Fleming was also granted a secured interest in ABCO's assets, junior only to Chemical Bank's senior position. A result of this restructuring was the dilution of the ownership interests of all stockholders, including Hill.[2] Hill testified that the only alternative to restructuring in 1991 was bankruptcy, an action that the company sought to avoid.

The first remodeled Desert Market store opened in June 1991. The concept was initially successful, but its continued success depended on ABCO's ability both to open new stores and to remodel existing ones in the Desert Market format. This created a pressing need for investment capital beyond that provided by the 1991 Restructuring.

### 4. The 1992 Restructuring

Negotiations for a more comprehensive restructuring were finalized on November 12, 1992 ("the 1992 Restructuring"). This effort was also spearheaded by Devening and Odyssey Partners and included the assistance of counsel acting on behalf of Odyssey Partners, Fleming and Chemical Bank. No outside financial advisors were employed or considered necessary. Devening testified that the parties "felt that [they] had the necessary resources among the group that was active in the affairs of the company to effect the restructuring."

---

**2.** The record reflects some evidence that after the 1992 Restructuring, ABCO's compensation committee retained 4% of the company's stock for management, 1.2% to go to each of Field and Hill and the rest to be allocated by them as they felt appropriate.

Although Odyssey Partners participated in the negotiations, neither it nor any of the other Noteholders were willing to invest any money in the restructuring. Fleming, by contrast, provided a significant infusion of capital, and all parties to the negotiations understood that, as a consequence, Fleming would become ABCO's largest shareholder, as well as its largest supplier and one of its two primary creditors.

The 1992 Restructuring was characterized by five significant changes:

First, Fleming, Odyssey Partners and the remaining Noteholders (from the 1991 Restructuring) formed ABCO Holding to serve as a new holding company for the operating assets.[3] ABCO Market's preferred stock and substantially all of the remaining Notes were exchanged for stock in ABCO Holding. The equity interests of those who did not contribute additional capital were diluted. Some original investor interests, including Hill's and Field's, were eliminated. Fleming, for $3 million in cash and an exchange of debt, obtained a 46.8% ownership interest in ABCO Holding and a warrant exercisable in certain circumstances to acquire enough additional shares to give it a majority of the outstanding ABCO shares. The issuance of this warrant was approved by the Noteholders.

Second, additional credit and loan agreements were entered into between ABCO/ABCO Holding and Chemical Bank and Fleming. Fleming loaned ABCO $11,450,000 to help finance ABCO's store remodeling efforts, secured by a second lien on the ABCO's assets. Once again, the plaintiff Noteholders did not provide any financial support in this restructuring.

Third, ABCO, through Hill, negotiated concessions with its unions and landlords for significant cost savings (approxi-

mately $9–10 million) over the next two fiscal years.

Fourth, the Supply Agreement between Fleming and ABCO was amended to require ABCO to purchase at least 51% of its dry groceries, perishables and general merchandise from Fleming and was extended to 2003.

Finally, ABCO Holding and each of its new stockholders entered into a new Stockholders Agreement ("Agreement"), under the terms of which: (i) the size of the ABCO Holdings board of directors was set at five persons, (ii) the Noteholders were given the power to designate three persons to the board, one of whom was required to be a member of ABCO's "senior management" (the Management Director"), (iii) Fleming was given the power to designate two persons to the board, (iv) in the event that Fleming exercised its warrant and acquired 50.1% of ABCO Holding's outstanding common stock, Fleming had the right to replace the Management Director with a member of ABCO senior management designated by it, (v) all ABCO stockholders were granted preemptive rights pertaining broadly to the issuance of shares of capital stock by ABCO, and (vi) a requirement of supermajority board voting (4 out of 5) was established to approve various enumerated transactions.

### 5. Article Eighth of ABCO's Certificate of Incorporation

Article Eighth of ABCO Holding's certificate of incorporation provides as follows:

No director will have any personal liability to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except: (i) for any breach of the director's duty of loyalty to the Corporation or its stock-

**3.** All future references to the "board," except where otherwise noted, are referring to the

board of ABCO Holding.

holders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, as amended or (iv) for any transaction from which the director obtained an improper personal benefit.

## 6. The Post–1992 Restructuring Board of Directors

Pursuant to the Agreement, Fleming appointed Devening and Field as its designees. The Noteholders appointed Hill, Edwin M. Banks ("Banks"), a portfolio manager with W.R. Huff Asset Management, and Edward C. Geiger, Jr. ("Geiger"), a former senior vice president of Merrill Lynch Asset Management, Inc. When Devening resigned from Fleming in July 1994, Fleming appointed Lawson, in his stead, as its second designee. Effective September 1, 1994, the ABCO board of directors unanimously agreed to increase the size of the board from five to six, in order to retain Devening as a director. Although the exact sequence of events leading to this action is not clear from the record, there is no doubt that the directors (and the stockholders represented by them) thereafter regarded Devening as a director.[4] They also approved and caused to be submitted to the stockholders for their consent an amendment to the Agreement expanding the board and allowing the appointment of this sixth director by the other five members of the board.[5] The proposed amendment also changed the super-majority vote required to 5 out of 6.

The board met annually in Oklahoma City, at Fleming's headquarters. Stauth (Fleming's president) attended these meetings, as did certain other key Fleming officers. Hill testified that the annual meeting was held in Oklahoma City as a courtesy to Fleming. He stated, "they [Fleming] were the supplier, and we were trying to build new stores and new remodels, and we thought as a courtesy once a year to meet there [in Oklahoma City] and try to let Fleming understand what we were trying to accomplish, so if I went to them for lease guarantees or that type of thing." Banks testified that the annual meeting was held in Oklahoma City at Fleming's request, and that while he would have preferred not to have to go there, it was "[n]ot a huge problem." Geiger testified that it was his understanding that the Oklahoma City meetings were held as a courtesy to Fleming because it had representation on the board. He stated, "I never really asked [why the meetings were in Oklahoma City] to tell you the truth.... [T]hey were the largest single shareholder, and it didn't seem out of place for that to happen to me, and we just—we had the meetings there. They were regular standard meetings. There was nothing different about that."

## 7. ABCO's Financial Problems

ABCO continued to experience financial problems, in part, due to its inability to close under-performing stores[6] and also as a result of the growing competition in the Arizona grocery market.[7] As a result,

4. Plaintiffs claim that Devening was asked to remain on the board by Stauth, on behalf of Fleming, and not by the Noteholder designees. However, they agree that the enlargement of the board from five to six directors was agreed to unanimously.

5. The record is unclear whether this proposal was ever fully approved and adopted by the stockholders. Nevertheless, Devening continued to serve as a director without objection and the parties behaved as though the amendment to the Agreement was fully executed. For the purposes of this decision. I consider that to have been done.

6. Hill testified to the major design, age and mechanical problems that existed at a significant number of ABCO's stores and caused them, consistently, to lose money. Notwithstanding the financial drain these stores caused. Chemical Bank refused to let ABCO close these stores except on financial terms that substantially reduced or eliminated the value of such action to ABCO.

7. Between June 1994 and December 1995, over 30 new stores were opened in the Phoenix area by ABCO's competitors. In addition, a competitor grocery chain, Megafoods, went into bankruptcy. Megafood's bankruptcy led

ABCO continued to lack adequate cash resources necessary to build and remodel stores in the Desert Market format. In 1994, ABCO defaulted on the Chemical Bank loan. ABCO obtained a waiver of this default, conditioned on a one-year acceleration of a $1 million principal payment, from September 1996 to September 1995.

### 8. ABCO's Search for Capital—Furman Selz

In early 1995, ABCO's board of directors began discussions regarding the need for approximately $30 million in additional capital. Field approached Stauth to inquire if Fleming would oppose ABCO's hiring an investment-banking firm to help it search for capital. Fleming was not opposed. Field then consulted with ABCO's counsel for suggestions and eventually retained the investment firm Furman Selz ("Furman Selz") to explore options for raising capital. Field was familiar with Furman Selz, having worked with them at American Stores.

Field testified that Furman Selz' work encountered unexpected delays. In the meantime, ABCO's financial position continued to deteriorate. Eventually, Furman Selz delivered a preliminary report to Field and Hill proposing a sale of ABCO accompanied by the cancellation of the Supply Agreement. Field testified that he and Hill knew this was not a solution, because ABCO had no legal basis to justify cancellation of the Supply Agreement.

> [W]e both told him there is no way that you are going to get out of that supply agreement. We signed it. There is no way to get out, because it has not been breached. And all you are going to do is cause us to get into a fight with our

supplier and one of our largest shareholders. Henceforth, that is a nonsolution and goodbye and thank you very much.

After consulting with their advisors, Field and Hill terminated Furman Selz' engagement in June 1995. The board was informed at its June 28, 1995 meeting and there was no objection. Plaintiffs do not contend that Fleming caused the termination of Furman Selz' engagement.

### 9. Lawson's Reports to Fleming

Lawson prepared a memorandum for Fleming's SIC summarizing his attendance at the board's June 28, 1995 meeting. This memorandum noted the general discussion regarding ABCO's search for capital and outlined the positions or conclusions of ABCO management as to how the company should proceed. Lawson testified that the purpose of the memorandum was "to introduce to [Fleming's] senior management the beginnings of some ideas that [he] had about something that Fleming might be able to do to help ABCO." These ideas primarily encompassed a possible recapitalization proposal.

One of Lawson's proposals to the SIC was secretly to "purchas[e] as much equity of ABCO up to the value of the shares presented by the total net enterprise of $25 million." Not surprisingly, Fleming was advised that this idea raised issues under the federal securities laws, and it was not pursued. Lawson testified, unconvincingly, that he could not recollect why the potential purchase was to be kept secret.[8] Lawson also suggested that Fleming could buy the Chemical Bank loan in full, thus giving Fleming the senior se-

---

to a price war among its competitors, including ABCO, as each lowered prices in an attempt to attract Megafood's market share and to keep its own.

**8.** In another report to the SIC, Lawson wrote, "I will provide you with Mike Freeman's calculations which show that the NPV [net present value] of this proposal to Fleming is more than $58 million. This is a significant win for

Fleming." Lawson testified that this statement was inaccurate, as $58 million was in actuality the NPV of ABCO's entire enterprise, and not its value to Fleming. He stated that the meaning of the phrase a "significant win for Fleming" meant that Fleming's investment in ABCO "looked like it would be perpetuated and be good."

cured lender position, and thereafter increase the line of credit by $5 million to provide ABCO with some added capital.

### 10. ABCO's Search for Capital—TCC

Shortly after terminating Furman Selz' engagement, ABCO hired its second investment banker, The Chicago Corporation ("TCC"), again on the recommendation of its outside counsel. Field, who did the hiring, was impressed by the TCC team, whom he described as "very hard and smart." TCC met with ABCO employees and management, visited several of the company's stores and received and reviewed documents.

On August 22, 1995, TCC presented its proposal to the board. While TCC discussed several alternatives, it primarily recommended the issuance of $30 million of convertible preferred stock of ABCO Holding to a new investor, plus the arrangement of a $30 million senior credit facility, consisting of a $10 million term loan and a $20 million revolving credit line, and, finally, an added $7 million in lease guarantees. On a pro forma basis, this proposal valued ABCO's stock at $30 per share.

The TCC plan would have required the approval of ABCO's stockholders under the Agreement, including their agreement to waive or repeal the preemptive rights provision. It also contemplated substantial and disproportionate concessions by Fleming. TCC's plan would have required Fleming to provide additional vendor credit, guarantee new store leases and subordinate its debt, and would have allowed ABCO to defer principal payments on the Fleming loan until 2001–all without the receipt by Fleming of any new equity or additional security. Fleming was not willing to make these concessions, either as a stockholder or pursuant to its various contractual arrangements with ABCO. Other financing options, such as the sale of the company and a preferred stock offering, were also included in TCC's presentation, but were not discussed in detail.

While TCC was preparing and presenting its proposals, ABCO's financial condition continued to deteriorate. By September 1995, ABCO could no longer meet its obligations to vendors and had defaulted on its obligations to Fleming and Chemical Bank. To stave off an immediate liquidity crisis, Fleming granted a $5 million extension on ABCO's outstanding trade payables for the specific purpose of providing ABCO the resources to make payments to ABCO's overdue, unsecured creditors. The board later approved the reclassification of these funds from an extension of trade credit to a loan. However, ABCO's failure to meet its obligations under the Chemical Bank loan caused an immediate default under the Fleming Supply and Credit Agreement, formal notice of which was given on September 26, 1995. These defaults triggered Fleming's right to exercise its warrant at any time through November 29, 1995. Fleming gave notice of its right to exercise the warrant on October 9, 1995.

### 11. Fleming's Recapitalization Proposal

Sometime before the August 22, 1995 board meeting, Lawson met with Field and told him (without going into detail) that Fleming planned to make its own recapitalization proposal at the upcoming board meeting. Stauth and Lawson then met with Field and Hill to introduce Fleming's recapitalization proposal to them. Among other things, they discussed the fact the Fleming was considering the purchase of the Chemical Bank loan. Field testified that his and Hill's reaction was, "[H]urray, we are finally getting some capital into the company."

Lawson presented Fleming's proposal at the August 22, 1995 board meeting. That plan called for Fleming's purchase of the Chemical Bank loan and also for it to make a series of investments in ABCO. In return, Fleming proposed to amend the Agreement to give it control over the board, and to eliminate preemptive rights and certain of the super-majority board vote requirements.

The directors then discussed various aspects of the TCC and Fleming proposals. Field, for instance, was concerned about ABCO's decreasing cash reserves and stated his preference for whatever proposal could be implemented first. Banks reacted negatively to what he perceived to be the "take it or leave it" manner in which Lawson presented Fleming's proposal. The directors determined to continue reviewing the two plans and to meet again when more information could be provided.

The board's next meeting, on September 13, 1995, was held primarily to consider Fleming's proposal. Banks testified that while the directors had not formally voted to approve or disapprove either plan, "the feeling was that in terms of timing, that the Fleming plan had an edge, because it did have a committed investor behind it." Moreover, Lawson indicated at the August 22, 1995 meeting that Fleming was unwilling to be diluted and, thus, would not approve or participate in the TCC plan.

During the September 13, 1995 meeting, Banks suggested that Fleming's plan be recast to permit all of the shareholders to participate in it. He testified that he "believed that there was significant value in the ABCO entity; that [Huff], as a shareholder wanted to participate in it; and that if the transaction could be structured differently, that [Huff] would be excited about participating in it." Other concerns raised by Banks included forming a special board committee of non-Fleming directors to negotiate a transaction and creating an exit strategy for the minority shareholders. The board then delegated to Banks the job of negotiating with Fleming, ABCO's corporate counsel and other interested persons to work out the final package. As a result, Fleming's proposal was restructured as a Rights Offering to all shareholders.

## 12. The Rights Offering

Eventually, the board of directors unanimously approved[9] a plan to recapitalize ABCO ("Recapitalization Plan") consisting of a rights offering to the stockholders ("Rights Offering") and concomitant changes in ABCO's governing documents. The Rights Offering contained the following financial terms: (1) the sale of up to a total of 1,068,610 shares of ABCO common stock at a purchase price of $20.00 per share, (2) the sale of up to an additional 750,000 shares of common stock in exchange for an agreement to provide sums that may be necessary to satisfy certain lease guarantees provided by Fleming and (3) the sale of participating interests in the $23 million Chemical Bank loan (to be purchased from Chemical Bank by Fleming) and the $5 million Fleming loan. Each stockholder desiring to participate in the Rights Offering was required to participate on a pro rata basis in each component of the Rights Offering.

The Recapitalization Plan also contemplated the termination of the existing Stockholders Agreement and approval of a new agreement that would result in, *inter alia*, Fleming's ability to elect a majority of the board, the elimination of the requirement for super-majority voting by the board to take certain actions and the elimination of preemptive rights. The proposed new agreement did provide stockholders with modified demand registration rights[10] and the protection of a super-majority vote of the board to approve certain conflict of interest transactions with affiliates (*i.e.*, Fleming). The Recapitalization Plan also called for certain amendments to ABCO's certificate of incorpo-

9. *See infra*, p. 397 for further discussion on the board's approval.

10. The registration rights provided that, if ABCO had not completed an initial public offering on or before January 1, 1996, then the company's receipt of a registration demand made by at least 15% of the outstanding shares of common stock would require ABCO to prepare and file a registration statement with the SEC and to use its best efforts to cause such a statement to become effective.

ration that required the approval of 80% of the outstanding shares.

Fleming expressed its intention to participate in all aspects of the Recapitalization Plan and Rights Offering, agreeing to purchase 500,002 shares (valued at $10,-400,040) in the stock offering, make all lease guarantees and purchase the Chemical Bank loan, then in default.[11] Fleming conditioned its commitment on two things, the required vote of at least 80% of the stockholders for approval of the plan and the increase in Fleming's stock ownership to 50.1% at the conclusion of the offering.

Stockholders were to be given three choices: (1) approve the Recapitalization Plan and participate in the Rights Offering, (2) approve the Recapitalization Plan but not participate in the Rights Offering, thus maintaining their interest, albeit diluted or (3) refuse to approve the Recapitalization Plan.

### 13. The Board Approves the Recapitalization Plan

At a September 20, 1995 meeting, the board unanimously approved the Recapitalization Plan and directed that it be submitted to the shareholders. Banks testified that he voted in favor only because it was his understanding that Fleming had conditioned its guarantee of a necessary lease on the board's unanimous approval of the Rights Offering. This understanding was not supported at trial.[12]

At the September 20, 1995 board meeting, Banks voiced, as a stockholder, his lack of support for the Recapitalization Plan, due to Fleming's insistence that stockholders choosing to participate in the Rights Offering participate, pro rata, in every element of it. Banks expressed his

view that the minority stockholders, many of whom were institutional investors, would find it difficult or impossible to purchase or stand behind lease guarantees due to constraints on their investment discretion. Banks did not suggest that the lease guarantees were unnecessary to the Recapitalization Plan nor that it was unfair for Fleming to seek to share the burden of those guarantees among all stockholders. Field testified that he preferred the Recapitalization Plan over the TCC proposal because he knew that ABCO could not pay the accelerated payment due in 10 days to Chemical Bank. In addition, TCC was six weeks behind schedule and Field stated that he felt that it would not be prudent to delay a capital infusion any longer. Devening testified that he approved the Rights Offering because he felt it was "the best alternative for all the shareholders at this particular time...."

A provision of the Recapitalization Plan, as approved, prevented ABCO from seeking alternative sources of capital while the Rights Offering was pending. Banks testified that he opposed this provision, since he felt it "would tie up the company's hands for a period of time...." He voiced these concerns to the board, but, as the standstill provision was a condition of Fleming's willingness to go forward, his concerns received no support from the other directors. Thus, TCC undertook no further work while the Rights Offering was outstanding.

### 14. ABCO Defaults and the Rights Offering Begins

ABCO failed to make the $1.0 million accelerated payment due Chemical Bank on September 30, 1995, thus the Chemical Bank loan went into default. By this time

---

**11.** The Private Placement Memorandum evidences the intended cooperation between the board and Fleming in implementing the aspects of the Rights Offering, including Fleming's purchase of the Chemical Bank loan and the board's consent to such a purchase.

**12.** Banks testified further that Field and Hill called him and "asked if I would vote for [the Rights Offering] in light of the fact that I was

going to be outvoted anyway." He continued. "I checked with a couple of attorneys to make sure I could express my disapproval of the rights offering as a shareholder but vote to support it as a director, but also informed the board that it was highly, highly likely that W.R. Huff would not be participating as a shareholder."

ABCO was also in default on the Supply Agreement and Fleming loan. Thus, Fleming had the right, for a period of 60 days, to exercise the warrant by which it could become the majority stockholder of ABCO. Plaintiffs point out that, at the time of these defaults, ABCO had sufficient cash on hand to make the required payments. But the record is clear that whatever cash ABCO had was the product of Fleming's agreement to make available to ABCO an additional $5.0 million for the specific purpose of paying vendors and unsecured creditors. ABCO's management properly did not view that money as being available for the purpose of paying either Chemical Bank or Fleming on their loans in order to avoid default. Field testified that the board knew that default was imminent, as it had been discussed at the multiple meetings of the board held throughout September. On October 2, 1995, Chemical Bank formally declared ABCO to be in default. Fleming also sent a formal declaration of default. Chemical Bank agreed to refrain from initiating foreclosure proceedings during the pendency of the Recapitalization Plan.

*15. The Stockholders Reject the Recapitalization Plan*

On October 26, 1995, the board voted 5–0 (Lawson abstaining) to authorize distribution of the private placement memorandum ("PPM") to be sent to the shareholders in connection with the Recapitalization Plan.[13] Members of the board informally met with minority shareholders and attempted to persuade them to approve the offering. Lawson attended all of the meetings. Hill and Devening attended some of them. Hill stated that he attended in his capacity as ABCO's operations person, because the company was in a "critical situa-

tion" and he "was the best person to express that and really plead, for [he] thought this was a solution to [ABCO's] problems, and gave [it] maybe—maybe, a chance to be successful." Devening testified that he attended these meetings as a favor to Lawson and Stauth and that his role in the meetings was to introduce Lawson to the representatives of the minority stockholders with whom he had dealt in the earlier restructurings.

At these meetings Lawson told the shareholders that if the Rights Offering was not approved, then Fleming "would have no alternative but to proceed with the foreclosure of its second security interest," although Fleming had made no final determination in this regard. In a memorandum to the SIC describing these meetings, Lawson noted that Fleming's foreclosure of ABCO's assets would "thereby mak[e] the value of the existing stockholders shares, including Fleming['s], worthless."

Lawson and Devening met with Brian Kwait ("Kwait"), a representative of Odyssey Partners and Odyssey–ABCO LP. Kwait testified that Lawson called him and asked to meet with him. At the meeting, Kwait expressed his disagreement with the Recapitalization Plan, and told Lawson that his "point of view was that the company should explore other avenues of unlocking what [he] perceived to be value in ABCO and not to use a rights offering as a vehicle for the company to effectively require all of the shareholders to reinvest in the company." To do this, Kwait recommended that the company set up an independent committee to evaluate all the different options that would be available, including bankruptcy or selling the company, because he felt that the com-

---

**13.** The PPM explained the events leading up to its issuance as follows, "Fleming proposed the Recapitalization Plan as an alternative to the financing plan proposed by TCC. After a series of meetings, the Company's Board of Directors unanimously approved the Recapitalization Plan. This determination was made as a result of substantial financial pressures on the Company under its credit agreement with Chemical Bank and its need for immediate lease guarantees necessary to develop new Desert Market stores combined with the lack of assurance that the TCC plan could be accomplished within the necessary time frame, the willingness of Fleming to commit substantial funds to the Company, and the lack of support by Fleming of the TCC plan."

pany "had a lot of value" and was "very asset-rich." Lawson testified that he interpreted Kwait's comments, "as a dare for Fleming to foreclose on its security interests." He noted that the meeting was "very, very unhappy" and that he took Kwait's comments personally, because he found them to be "very disturbing and very personally insulting."

Lawson, Devening and Hill also met with Banks, who testified that he "told them that [Huff] continued to be in opposition to [the Recapitalization Plan]," and that he "thought that there were other options that continued to be available that would allay some of [Huff's] concerns about the direction the rights offering was going, and that this was, you know doomed to fail, and that [the board] should be considering other options." Banks also suggested that Fleming should offer to buy out the minority shareholders.

Lawson and Hill also met Walter J. Barrett ("Barrett"), a high-yield bond analyst and representative of Prudential. Barrett testified that it was a "very short meeting" during which he "basically just read them the riot act," because Prudential was "exceptionally unhappy with the performance of the company." Barrett stated in his deposition that prior to the meeting, he did not review the information pertaining to the Recapitalization Plan and that he was not sure if he even gave Lawson or Hill a chance to explain the Rights Offering. Instead, Barrett stated that Prudential wanted one of two things in connection with its investment with ABCO; it "either wanted the company sold or [it] wanted ABCO funding to buy [its] equity position, because that was the only way that [it] could realize what [Barrett] felt was substantial value in the company." Barrett also noted that a Chapter 11 bankruptcy might be appropriate.

Lawson summarized these meetings in a memorandum to Stauth, as follows: "[t]he results have been mixed as most of the shareholders have demanded to have their interest bought out by Fleming rather

than go along with the deal. We have indicated that this is not an option as Fleming does not have the room in its deal to get in a bidding war with the various shareholders as to the value of their shares." The memorandum closed stating:

In summary, we are working to get the cooperation of the other shareholders. It is too soon to tell whether we will be able to proceed with the Rights Offering as originally planned. We have the alternative, in the event of a failure of the Rights Offering to offer to buy out the other shareholders (at potentially extortive prices) or proceed with a foreclosure. At this time, we believe that proceeding with the Rights Offering and keeping the option of the foreclosure open is the best course by Fleming. We will consider the buy out of the other shareholders if it is determined the price demanded is reasonable and the foreclosure is going to be difficult.

In describing these meetings to the SIC, Lawson noted that, perhaps contrary to the committee's earlier discussion, he elected not to discuss the prospect of a Fleming stock repurchase with the shareholders, primarily because it was his understanding that the stockholders were "testing the water" and that they had all "intimated that they would start a bidding war if [Fleming] even intimated that it 'might' look at a stock purchase."

### 16. Fleming Negotiates the Purchase of the Chemical Bank Loan

In connection with the Recapitalization Plan, Fleming entered into negotiations with Chemical Bank to purchase the bank's senior loan and security interest. When the Rights Offering failed, Fleming decided to buy out Chemical's position for its own account. At the same time, Fleming decided to foreclose on its junior security interest. As Lawson explained, buying out Chemical's position was expected to strengthen Fleming's hand in the subsequent foreclosure. Lawson testified as follows:

We had determined that—actually, we'd been advised that we could foreclose our second position but it was a bit cumbersome. Because ... the collateral[ ] would be taken subject to the Chemical Bank loan. And we felt it would be a significantly cleaner foreclosure sale ... if it was not subject to the Chemical Bank indebtedness or security interest.

After some discussion and negotiation, Chemical Bank agreed to sell its interest to Fleming for an amount equal to 100% of its total claim.

### 17. Fleming Exercises its Warrant

On November 17, 1995, the Rights Offering expired unsuccessfully, and the Recapitalization Plan failed. The same evening, Lawson called Hill and told him that Fleming wished to exercise its warrant and to take possession of the shares the next day, Saturday, November 18, 1995.[14] Hill immediately called Field to ask him what to do. Field stated that Fleming had a legal right to exercise its warrant and told Hill to deliver the shares as requested. Hill did so, delivering the shares in exchange for a check for the exercise price of the warrant. As a consequence, Fleming became ABCO's majority stockholder, owning 50.1% of the company's stock. Pursuant to the Agreement, once Fleming became the majority stockholder, it obtained the right to replace the Management Director (Hill) with its own management designee.

### 18. The Board Meets on November 20, 1995 and Approves Fleming's Purchase of the Chemical Loan

The board met on Monday, November 20, 1995, by telephone conference call. The meeting began at 8:30 a.m. and concluded at 9:05 a.m. All of the directors were present. Also in attendance were Messrs. Robert S. Kant ("Kant"), Gilbert L. Rudolph ("Rudolph") and Richard M. Lorenzen ("Lorenzen"), three senior members of O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A., ABCO's outside counsel, Mr. David Martin ("Martin"), ABCO's outside auditor, and Mr. John Mee ("Mee"), of McAfee & Taft, counsel to Fleming.

At the outset of the meeting, Hill announced the failure of the Recapitalization Plan, only Fleming and one other stockholder having agreed to participate or having voted in its favor. Hill also announced that the directors would be asked to vote on Fleming's proposed acquisition of the Chemical Bank debt. Lawson described Fleming's plan to purchase the Chemical Bank loan and to begin foreclosure proceedings against the assets securing that loan and Fleming's junior position. Hill and Lawson then described for the directors the company's worsening financial picture.

The written agreement between Fleming and Chemical Bank was negotiated as a part of the Recapitalization Plan. It was structured as an Assignment and Assumption Agreement and its signature page contained spaces for the acknowledgment and consent of ABCO Markets, ABCO Holding and ABCO Realty, the owners of the collateral securing the underlying obligations. There were different views expressed at the November 20 board meeting as to what vote of the directors was required for ABCO to consent. Mr. Kant stated that a super-majority vote was required under the Agreement, since Fleming was an interested party. Lawson and his counsel Mee disagreed. This disagreement became moot when the actual vote in favor (5 to 1) was sufficient to satisfy the super-majority provisions of the Agreement.

Messrs. Kant, Rudolph and Lorenzen discussed with the board the duties and responsibilities they had as directors of a Delaware corporation to both stockholders and creditors in considering whether or

---

**14.** That Lawson wanted the shares delivered on a weekend day is explained by the fact that he worked in Oklahoma City, spending only weekends in Phoenix, where he and his family lived.

not to approve Fleming's acquisition of the Chemical Bank loan for the purpose of foreclosing on it. According to the minutes of the meeting, they specifically informed the directors "of the expanded rights that Fleming would have as the holder of the Chemical Bank Loan and the differences between Fleming and Chemical Bank holding a prior security position in the collateral for the loan." Kant also advised the directors that TCC had reiterated its willingness to work with the company in pursuing alternative financing schemes. Lawson pointed out, in response, that there was no assurance that TCC could succeed.

Geiger expressed concern over ABCO's obligations to its unsecured creditors and vendors. In response, Lawson, on behalf of Fleming, agreed to ensure that all of ABCO's unsecured debt obligations were satisfied, regardless of the results of the foreclosure sale, on the condition that the board proceeded with the sale.[15] Fleming's promise enabled the board to make 100% payments on all debt owed to its unsecured creditors and vendors, which in turn maintained the supply of products that ABCO needed to keep its stores operating during the period leading up to the foreclosure sale.

Thereafter, the board voted 5–1 to approve Fleming's acquisition of the Chemical Bank loan. Banks dissented because Fleming would be "adding one more level of control" over ABCO, and Fleming's position of first lien creditor and controlling stockholder created basically a "checkmate on [ABCO's] entire capital structure" that he "didn't think that was necessarily in the interests of ABCO shareholders." Geiger, the other minority stockholder representative on the board, testified in deposition that he voted to approve the Chemical Bank loan "because this was a viable solu-

tion to the problems of ABCO, and it meant the continuing existence of the company as an entity, and there was nothing— there were no better alternatives at the time."

During this meeting, the option of bankruptcy was discussed. A week or two prior to the November 20 board meeting, at Kant's recommendation, Field and Hill met privately with Messrs. Rudolph and Lorenzen, bankruptcy specialists, to discuss the opportunities and pitfalls of ABCO declaring bankruptcy. Field testified that this discussion reconfirmed his earlier view that bankruptcy was not in the best interest of the shareholders because ABCO would not survive the bankruptcy. Hill also concluded that a bankruptcy filing was not a viable option, equating bankruptcy with a liquidation of the company. He testified that he had never seen a grocery chain bankruptcy in which equity holders received any value.

Field suggested to Kant that his bankruptcy partners attend the November 20, 1995 meeting in order to give advice on the subject. They agreed and both were in attendance. When the issue of bankruptcy came up, Field told the board that "[he] did not think [bankruptcy] would be of any advantage to ABCO and to any shareholder because [he] did not think at that point that ABCO was worth its debt." Hill testified that after the board's discussion, "I felt and the rest of the board seemed to feel ... that [bankruptcy] was not a good alternative because basically we looked at that as liquidation, and that wouldn't protect anybody."

The minutes reflect that the issue of bankruptcy was discussed in the context of challenging Fleming's exercise of its warrant. Kant told the board that ABCO could challenge Fleming's actions by filing

---

**15.** Fleming's commitment was evidenced in writing in a letter from Lawson to ABCO dated November 22, 1995. In this letter, Lawson stated, "Pending completion of the foreclosure upon the assets of ABCO, Fleming agrees with ABCO that it has undertaken to cause to be satisfied on an ongoing basis, as the same become due in accordance with normal business practices, the valid, outstanding unsecured obligations of ABCO to its trade and other creditors."

for bankruptcy immediately. The board discussed this option but decided not to file a bankruptcy petition.

### 19. Lawson Reports the Results of the Board Meeting to the SIC

In a contemporaneous memorandum to the SIC, Lawson summarized the events at the November 20, 1995 meeting, as follows:

> All Board members were present and ABCO's legal counsel, Bob Kant presented what was his proposal, to require a 'super majority' vote of the Board to approve the purchase of the Chemical Bank loan by Fleming. Out of the box, this spelled real trouble for Fleming and ABCO as a super-majority required 5 out of 6 votes, and Fleming only had commitments from 4 Board Members.

The memorandum continues, stating, "I assured the swing vote [i .e. Geiger] that Fleming would see to it that during the foreclosure, it would make certain that the unsecured creditors were taken care of, if necessary by Fleming." Later in the memorandum, Lawson wrote, "Three cheers for Randy Devening, Tom Field, and (even) Ed Hill, who in the 11th hour stepped up and took risk by voting in favor of our position." Lawson also wrote the following to the SIC:

> Ed Hill and Tom Field are in line, we control all of the secured indebtedness and we own a majority of the stock. We will work on sugar coating the press issues, pay the unsecured creditors and foreclose the assets and leases. We will complete the foreclosure by the third week of December (if all goes well).

At trial, Lawson attempting to dispel the impression that he had obtained advance "commitments" from directors Devening, Field and Hill or that Hill and Field were under Fleming's control. He testified that

"[a] better way to have written [this paragraph] would have been that we believed that four of the board members would have voted in favor of it, because we had been discussing this for sometime."

At trial, Devening and Field testified quite forcefully and convincingly that they were not dominated or controlled by Fleming or otherwise operating under some improper influence in acting as ABCO's directors.[16]

In further reference to Fleming's plan to buy the Chemical Bank loan, the memorandum states: "This part of the meeting was very argumentative and ABCO's counsel tried, in my opinion, to block our taking control of the loan." It continues, "The final block attempted by [ABCO's counsel] was to have the Board vote to have ABCO breach our written stock warrant agreement ... by refusing to permit the issuance of the new shares giving Fleming controlling interest." This issue was resolved when Hill informed the board that he had issued the shares to Lawson as requested on November 18, 1995. Thus, Lawson's next notation reads, "The issue was thereafter considered moot. Mr. Kant [ABCO's corporate counsel] recommended litigation against Fleming to stop and reverse the exercise of the warrant. This was also rejected."

The memorandum next discusses Lawson's conversation after the meeting with Martin, an independent auditor with Deloitte and Touche, and an ABCO advisor for many years. During their discussion, Martin told Lawson that, in his opinion, the shareholders were being treated unfairly. Lawson noted in his memorandum that he told Martin "about pigs and hogs and how things shaped up and how reason-

---

**16.** Devening testified: "I think the responsibilities as a member of the ABCO board or any board, for that matter, are to become knowledgeable about the operations of the company and be able to carefully evaluate situations that come to the board level with respect to operations and prospects and keep the interests of ABCO and all its shareholders in mind in exercising that responsibility." Field testified that he represented 100% of the stockholders and that his duties to the minority stockholders were "[t]o represent them no different than anybody else and to use good business judgment, which is what I was put on there for."

able [Fleming] had been." At trial, Lawson clarified this language that he referred to as a "colloquial expression," explaining that "pigs get fat and hogs get slaughtered" and this means "in very general terms ... that it's okay to be a pig, but don't be a hog ." Lawson further testified that this language was "totally inappropriate," and explained that it derived from his frustration at what he felt were "unrealistic expectations" of certain of the minority shareholders. In the memorandum, Lawson also told Martin "that the election not to proceed [with the Rights Offering] was solely in the hands of the other shareholders, not [Fleming]. They passed up on a deal where they didn't have to put up one penny .... They [the minority stockholders] said (in an extortative [sic] context) NO, pay us off.

The memorandum concludes stating, "WE HAVE left the door open to the minority shareholders coming to Fleming with a proposal to 'settle' all claims, but ONLY as a group. No more divide and conquer. We will maintain our tough but fair position and see this through."

*20. Fleming Buys the Chemical Loan and Forecloses*

On November 20, 1995, Fleming paid off the balance of the Chemical Bank loan, as well as all of the accrued but unpaid interest and attorneys fees, and became ABCO's senior secured creditor. Fleming thereafter noticed the foreclosure sale for January 9, 1996. Around this same time, and pursuant to its written agreement with ABCO dated November 22, 1995, Fleming also began making payments to ABCO's unsecured creditors and vendors.

*21. The Board's Final Meeting Prior to the Foreclosure Sale*

After the November 20, 1995 meeting, Banks wrote to Field and Hill expressing concern over Fleming's intention to foreclose and requesting a special meeting to discuss the company's options. Banks testified that he wrote this letter:

[b]ecause I didn't feel that the board had properly considered ... from a shareholder point of view ... the ramifications of Fleming taking over the Chemical loan, that the company had to be thinking in terms of what other options were available to the stockholders, now that this had happened and Bill Lawson had made the rather aggressive threat to foreclose on the loan. And I thought for a board to endorse or go along with an action that to me is a creditor's remedy, foreclosing on assets, was not in the best interests of the stockholders; that the board should consider Chapter 11, should consider moving on with the Chicago Corp. proposal, should consider looking for merger partners and be protective in stopping the foreclosure process.

Banks also called Field to see when such a meeting could be had, but was told that a special meeting would not be scheduled and that he could raise his concerns at the board's next regularly scheduled meeting on December 13, 1995.

At this meeting, Banks outlined the points raised in his earlier letter and stated:

his firm belief that [the board was] allowing Fleming to pursue a remedy as a creditor, rather than as a stockholder; that if Chemical Bank had called and said, 'We were going to foreclose on the loan,' probably our only option would be to file Chapter 11, and we should be looking at this as non-Fleming representatives, representatives of all the stockholders, and trying to achieve the best result for all, rather than one.

Banks then moved that the board authorize the filing of a Chapter 11 bankruptcy petition to protect ABCO against foreclosure. A discussion ensued, after which the motion failed for want of a second. Devening testified that he did not second the motion "because he felt very strongly that bankruptcy was not an alternative that was in the best interests of all the share-

holders for this company at this time." He continued:

> The retail bankruptcies that I have seen in the great majority of the cases result in a complete meltdown, and so there is really nothing of any substance left in terms of the operating consumer [sic] equity to the retail chain. And I thought there was a better chance to preserve that and preserve the maximum value for all the shareholders without a bankruptcy.

> \* \* \* \* \* \*

> [A meltdown is where the] stores find themselves in a position where they don't have product. They lose labor. They lose some of the things that make customers want to shop in stores, attitudes of employees and so forth, and you lose customers. And the retail food business is very competitive, and if you lose that customer and somebody else gets him, it is going to be tough to pull him away, And that happens, and pretty soon the average weekly sales go[ ] down and it gets to a level where you are not cash-flowing at all on an individual store basis.

During this meeting, Banks also indicated his belief that ABCO was a good acquisition candidate and that the board was moving "too far and too fast" as a result of Fleming's position as primary creditor and stockholder. Devening and Geiger expressed disagreement with Banks' perspective. The minutes note Devening's statement (evidently a reference to the terms of the 1992 Restructuring) "that the stockholders had thoroughly negotiated the arrangements under which Fleming had become a principal stockholder and creditor as well as various default provisions applicable to ABCO's obligations to Fleming." Geiger was in accord, and the minutes reflect that he disagreed with Banks' view that the directors were moving too far and too fast. No bankruptcy or financial advisors were present at this meeting.[17]

At Banks' request, the board authorized him to distribute information to third parties potentially interested in ABCO, conditioned on the third parties' execution of confidentiality agreements. The day after the meeting, TCC provided Banks with a list of names and phone numbers of parties that it felt might be interested in reviewing information about ABCO in connection with the foreclosure sale. Banks never contacted any of them.

### 22. The Foreclosure

The public sale of the collateral was set for January 9, 1996. One month prior thereto, notice of the sale was given nationally in the Wall Street Journal and industry-wide in an industry periodical. Specific mailings were made to known competitors of ABCO and to other parties expressing interest. The board undertook no separate solicitation, nor did it authorize TCC to contact any potentially interested parties. Hill testified that he did not regard it as being in ABCO's best interest for TCC to do so, since a decision to buy ABCO was an operating decision and the TCC people were "number crunchers," inexperienced in matters of grocery store chain operations.

As the creditor conducting the sale, Fleming maintained all of the available documentation at a site in Phoenix located not far from ABCO's headquarters, except lease agreements, which were kept at ABCO. Fleming required any person interested in examining the available documentation and information to execute a confidentiality agreement. Several did.

As planned, the sale was held on January 9, 1996. In addition to Fleming and its representatives, the sale was attended by representatives of Safeway, Inc., Ba-

---

17. As usual, Lawson prepared a memorandum for the SIC summarizing the events of the board's December 13, 1995 meeting. It begins, "Well, the 13th ended up being our lucky day. Today in Phoenix we held what will be, most likely, the last Board of Directors Meeting for ABCO as a stand alone entity."

shas' Markets, Inc. and Just 'N Time. None of these other parties bid. Mee, bidding for Fleming, offering $66 million, or the exact amount of the indebtedness being foreclosed, for all of the collateral as set forth in the notice of sale. Thereafter, all creditors, secured and unsecured were paid in full. The owners of ABCO equity received nothing.

### 23. The Fleming Valuation Memoranda

In discovery, documents were produced that, plaintiffs contend, show Fleming's willingness to have paid more at the foreclosure sale than proved necessary. Lawson and Stauth both testified that Lawson, as Fleming's representative, had authority to bid higher than the credit amount, but neither admitted remembering just how much more Fleming was prepared to pay. In a later part of this opinion, I conclude that Fleming had no duty to pay a fair price at the foreclosure sale. For this reason, I consider it unimportant to know how much Fleming was prepared to bid. Nevertheless, the record shows the following about these documents.

First, in early December, Lawson and a Fleming financial analyst prepared a memorandum discussing four ABCO foreclosure sale valuation scenarios. In part, this memorandum was prepared to help Fleming determine the maximum it should be prepared to bid at the foreclosure sale "should [it] have serious competition for the ABCO assets." These analyses were based, in part, on information obtained from ABCO, either under the terms of Fleming's loan agreement or otherwise. This memorandum was not shared with ABCO's board of directors. Excluding the incremental value to Fleming's warehouse business, the memorandum concludes that ABCO's value was between $47 million (baseline) and $66.4 million (assuming 8 new store openings and 14 remodels through the year 2000). Including the incremental value to Fleming's warehouse business, the memo indicated much higher baseline and growth scenario values (be-

tween $139.4 (baseline) and $172.6 million (with assumed growth)).

Second, on December 12, 1995, Lawson and others received an e-mail message attaching a spreadsheet analysis correlating a range of possible prices to be paid at the foreclosure sale and the corresponding per share amount required to buy out the minority shareholders. When asked about this e-mail at his deposition, Lawson stated that it "was prepared in anticipation of the foreclosure sale and really is a matrix which talks about the proceeds of the foreclosure sale and how those proceeds would be paid among minority shareholders." At trial, Lawson testified that this was information he considered useful in analyzing Fleming's alternatives.

### 24. Lawson's Final Word

Shortly after the foreclosure sale, Lawson prepared another memorandum. It stated, "As Bob Stauth told Tom Zaricki, 'congratulations, you're a grandfather again.'" To understand his meaning, Lawson explained that one would need to read this statement in context, beginning with the sentence, "My duties as a midwife, now concluded, I will now go onto the next case." Later in this memorandum, Lawson refers to the work performed for ABCO by Furman Selz and TCC and notes, "Both of these 'boys' will be big time witnesses for the evil minority shareholders in the pending litigation." He explained that "[t]his was really conjectural on my part. I didn't know that they would be. I felt that they had a familiarity with ABCO and that they had made proposals to ABCO which might be useful to the minority shareholders in the present litigation that had filed an action against Fleming." When asked why the minority shareholders were "evil," Lawson continued his explanation:

> There were certain shareholders at the time I drafted this memorandum that had filed a lawsuit against Fleming and certain directors, including myself. And I took this lawsuit by these minority shareholders quite personally, and I re-

ferred to them, I will tell you, inappropriately as evil. I do not believe they are evil, but this was the adjective I used to define them to emphasize my emotions about the lawsuit and their actions.

The memorandum continued by noting that it was Lawson's opinion that TCC would be the "star expert witnesses" against Fleming and the directors, and that Fleming should retain TCC to be its "experts" in the litigation. He stated that "[t]his might be a little tricky," and at trial testified that after discussion with counsel, determined that such a retention was inappropriate and dropped it.

## II. DISCUSSION

Because they cannot attack the foreclosure sale directly,[18] and because there is no duty of care claim in this case,[19] the plaintiffs argue that Fleming's acquisition of the ABCO Market stock for a "credit bid" at the foreclosure sale was the outcome of an extended pattern of faithless behavior by Fleming and the ABCO board of directors. Fleming is said to have breached its fiduciary duties by exercising *de facto* control over ABCO and a majority of its directors, in such a manner as to "frustrate or foil" ABCO's efforts to raise needed financing or capital, in order to protect Fleming's position as controlling shareholder. The director defendants are claimed to have acted disloyally and in bad faith in favoring Fleming's interests over those of ABCO or its minority stockhold-

ers. Plaintiffs focus, in particular, on the directors' approval of the Fleming/Chemical Bank transaction and their acquiescence in the ensuing foreclosure.

The attack on the long-term conduct of Fleming or the board of directors was unsupported factually at trial. In particular, it is notable that every decision of the ABCO board of directors until their November 20, 1995 meeting was taken unanimously. The absence of dissent by plaintiffs' own board representatives substantially discredits their after-the-fact charges that their fellow directors acted with disloyalty or in bad faith. *Nebenzahl v. Miller*, Del. Ch., C.A. No. 13206, Steele, V.C., *5, mem op. at 12 (Aug. 26, 1996) (unanimous vote of both interested and disinterested directors entitles board to the benefit of the business judgment rule).

Nevertheless, this case is analytically difficult because the foreclosure sale resulted in ABCO's 50.1% stockholder (Fleming) owning 100% of its assets, while ABCO's other stockholders ended up holding shares worth nothing. Assuming that ABCO had a net asset value materially greater than zero, general principles of our law disfavoring non-prorata distributions of corporate assets would require, at a minimum, the most intense scrutiny of the events of November 20, 1995 and thereafter. Certainly, the directors' approval of Fleming's acquisition of the Chemical Bank loan, and their relative passivity in the face of Fleming's plan of foreclosure, would be difficult or impossible to justify if

---

18. It is an unusual aspect of this case that the transaction by which Fleming acquired the shares of ABCO Markets was not one *between* Fleming and ABCO, in the normal sense of a related party transaction. Fleming *bought* those shares at the foreclosure, but ABCO did not agree to *sell* them. Rather, Fleming acquired the shares by operation of law, as the high bidder at the statutory foreclosure sale. In the circumstances, there is no precedent for applying a fiduciary duty analysis to the conduct of the January 9, 1996 foreclosure sale or the terms of Fleming's winning bid. *See Odyssey Partners, L.P. v. Fleming Co.*, Del. Ch., C.A. No. 14770, Allen, C., 1996 WL

422377, *3, mem. op. at 6–7 (July 24, 1996) ("Thus one who may be both a creditor and a fiduciary (*e.g.*, a director or controlling shareholder) does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditor rights.").

19. In view of the exculpatory provisions of Article Eighth of ABCO's certificate of incorporation, the claims against the defendant directors are cast exclusively in terms of their duties of loyalty and good faith, as confirmed by plaintiffs' supplemental post-trial brief, dated April 19, 1999.

Fleming had thereby acquired something of material value to the detriment of the other stockholders. In contrast, if the net asset value of ABCO was zero or less than zero, there would be no material non-prorata distribution and the directors' conduct would be understandable in terms of their fiduciary duties. In that case, the plaintiffs' argument—that the directors should have refused to cooperate in the foreclosure process in an effort to force some payment to the stockholders—would take on a different coloration. While possibly securing some value for the minority stockholders, such action could also have jeopardized both the interests of ABCO's creditors in full payment of monies owed to them and the interests of the corporate enterprise as a whole.

As will be discussed later in this opinion, the evidence leads me to conclude that the fair market value of ABCO's equity was not worth more than ABCO's debts in November and December of 1995 and into the early part of January, 1996. In other words, the record supports the conclusion that the foreclosure sale did not result in any non-prorata distribution. In the circumstances, I find that the conduct of the defendant directors on and after November 20, 1995, comported with their fiduciary duties to ABCO, its creditors and stockholders.

## A. Fleming Did Not Control ABCO's Board of Directors

Plaintiffs first contend that from the 1992 Restructuring until the exercise of its warrant in 1995, Fleming "was the dominant presence and controlled the actions of ABCO through its control of the individual board members." This *de facto* control is alleged to have been used to "frustrate attempts to raise necessary capital for ABCO, merge with other companies, or otherwise solve ABCO's financial problems in ways that would have been in the best interests of ABCO and Plaintiffs."

### 1. Standard

A party alleging domination and control of the majority of a company's board of directors, and thus the company itself, bears the burden of proving such control by showing a lack of independence on the part of a majority of the directors. *See Blish v. Thompson Automatic Arms,* Del. Ch., 64 A.2d 581, 595 (1948) (a plaintiff who alleges domination of a board of directors and/or control of its affairs must prove it). An independent director is one whose decision "is based on the corporate merits of the subject before the board rather than extraneous considerations or influence. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 816 (1984). A controlled director is not an independent director. *In re MAXXAM, Inc.,* Del. Ch., 659 A.2d 760, 773 (1995) ("To be considered independent, a director must not be 'dominated or otherwise controlled by an individual or entity interested in the transaction.'").

Control over individual directors is established by facts demonstrating that "through personal or other relationships the directors are beholden to the controlling person." *Aronson,* Del.Supr., 473 A.2d at 815. If plaintiffs are unable to meet their burden, then the board's actions are governed by the business judgment standard of review. *See Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717, 720 (1971) ("A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose. A court under such circumstances will not substitute its own notions of what is or is not sound business judgment.").

### 2. Fleming Did Not Exercise *de facto* Control Over ABCO

My review of the record and observation of the character and demeanor of the witnesses at the trial convinces me that the majority of the board was not dominated or controlled by Fleming. Indisputably, Banks and Geiger were not

controlled by Fleming. Just as clearly, Lawson was. I find that the three remaining directors were independent of Fleming. I reach this decision mindful of the numerous references in Lawson's memoranda that, if credited, would strongly support an inference of control by Fleming over one or more of Devening, Field or Hill. Nevertheless, I conclude that Lawson's memoranda are not credible in this regard. Rather, those memoranda consistently overstate Lawson's mastery of people and situations, evidently for the purpose of exaggerating his accomplishments. More importantly, the testimony and demeanor of Devening, Field and Hill convinced me of their independence and good faith.

■ When Fleming became the majority stockholder, it could be argued to have obtained such control over ABCO to support an inference that Field and Hill, ABCO's senior executives, could no longer act independently of it. *Rales v. Blasband,* Del.Supr., 634 A.2d 927, 936–37 (1993) (holding, for purposes of demand futility, well pleaded facts sufficient to raise reasonable doubt about corporate managers' ability to act independently of controlling stockholder.) Ultimately, however, the question of a director's loyalty is one of fact to be decided from the entirety of the record. The record of this matter, as a whole, leads me to conclude that Field and Hill acted independently of Fleming and at all times acted in what they reasonably believed to be the best interests of ABCO.

*a. Devening*

Devening was a senior officer of Fleming from 1992–1994. During this period, he also served as one of Fleming's designees on the board of directors. At that time, at least, he was in a position of conflicted loyalty and cannot be considered to have been independent of Fleming. *See Rales,* Del.Supr., 634 A.2d at 936–37.

The issue, however, is whether his continued service on ABCO board after he resigned from Fleming's employment should be regarded as independent of Fleming. Devening was replaced by Lawson in 1994, as one of Fleming's two representatives. His fellow directors unanimously asked him to continue serving as a director because his experience and advice were valued by the other directors. Certainly, Geiger and Banks would not have agreed to Devening's appointment as the sixth director, or permitted his continued service without objection, if they regarded him as a Fleming loyalist.

The fact that Devening was a former Fleming officer and designee is not, alone, a sufficient basis for a finding that he was controlled by Fleming. *See Aronson v. Lewis,* Del.Supr., 473 A.2d at 816 ("It is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of the corporate election. That is the usual way a person becomes a corporate director."); *Andreae v. Andreae,* Del. Ch., C.A. No. 11905, Hartnett, V.C., 1992 WL 43924, *5, mem. op. at 12–13 (Mar. 3, 1992) (noting that Delaware courts have consistently rejected the argument that a director cannot act independently of the entity that appointed him or her to the board); *Stein v. Orloff,* Del. Ch., C.A. No. 7276, Hartnett, V.C., 1985 WL 11561, *3, mem. op. at 10 (May 30, 1985) (directors appointed by controlling shareholder were not necessarily beholden to the controlling shareholder).

I am also untroubled by Devening's "consulting agreement" with Fleming. Certainly, in the context of Devening's compensation from non-Fleming sources, it is meaningless as a financial issue. *See In re MAXXAM, Inc.,* Del. Ch., 659 A.2d at 773–74 (1995) (finding that only because there was significant and generous compensation by a majority shareholder to three directors to act as consultants were they determined not to be independent).

Finally, Devening's participation in the lobbying efforts of Lawson and Hill in connection with the proposed Recapitaliza-

tion Plan does not evidence any lack of independence. Devening testified that his role in these meetings was to introduce Lawson to the principals of the minority shareholders and other organizations with whom he had worked with during the 1991 and 1992 Restructurings. The Recapitalization Plan was a company proposal, approved by a unanimous vote of the directors for submission to the stockholders. Devening cannot be faulted for acting in support of a proposal that the entire board felt was in the best interests of the company.

### b. Hill

Hill was the President and COO of ABCO. He was also plaintiffs' Management Designee on the board of directors. Hill accompanied Lawson and Devening on the trips to lobby for support for the Recapitalization Plan. As they did with Devening, plaintiffs argue this evidences Fleming's control over him. I conclude it does not. Hill testified that, due to his positions in management, he was the person the best suited to explain ABCO's precarious financial situation to the minority shareholders. That he attended these meetings, or that he was asked to attend them by Lawson, does not show a lack of independence.

Plaintiffs also point to a public statement made by Hill at the time of Fleming's notice of foreclosure as evidence of his lack of independence. The evidence shows only that, as would have been expected of him as President of ABCO, Hill made a public statement to ABCO's cus-tomers, vendors and suppliers, intended to reassure them that the foreclosure would not result in negative financial or operational consequences for the company. Plaintiffs also contend that Hill "manipulated the financials of ABCO"[20] so that the company would "come out of the foreclosure swinging." Hill's trial testimony convincingly refuted this allegation.

Plaintiffs further complain that Hill "disregarded ABCO's lawyers advice not to issue shares to Fleming pursuant to a stock warrant." Plaintiffs were unable to support this claim at trial, as they failed to show any legal basis on which to refuse Fleming's request to exercise the warrant. Hill testified that he contacted Field after Lawson notified him that Fleming had decided to exercise its warrant and that Field told him Fleming had a right to exercise the warrant and that Hill should allow it.

### c. Field

Plaintiffs challenge Field's independence by pointing out that he and Devening were neighbors and that he scheduled yearly meetings of the ABCO board of directors at Fleming's headquarters in Oklahoma City.[21] Plaintiffs also note that Field consulted with Fleming regarding possible acquisition candidates for ABCO and stated that Fleming's acquisition of ABCO "made perfectly logical sense to him."

That Field and Devening were neighbors or former neighbors is of no moment. *See In re Grace Energy Corp. Shareholders Lit.*, Del. Ch., Cons.C.A. No.

---

**20.** Plaintiffs base their complaint on a statement by Lawson in his December 5, 1995 memorandum to the SIC, which reads, "Ed Hill admitted today, 12–5, that he and his team were 'cleaning up some old liabilities' and in part that's why the numbers for August, September, October (and I suspect November) look so bad. Per Ed, he is trying to position ABCO to come out of the foreclosure swinging." At trial, Hill emphatically denied that he had manipulated ABCO's financial information. His testimony was credible and plaintiffs were unable to rebut it by showing evidence otherwise. In addition, Lawson's

contemporaneous memoranda are not, necessarily, accurate in their recitation of events.

**21.** Field became involved with ABCO in 1991 when he was hired by Fleming as a consultant in connection with the 1991 Restructuring. In 1991 he was appointed to the Board of Directors as Fleming's designee and, later that year, was named Chairman. In 1992, Field became Chief Executive Officer. He continued to serve as Chairman and CEO until sometime after the foreclosure sale.

12464, Hartnett, V.C., 1992 WL 145001, *4, mem. op. at 10 (June 26, 1992) (conclusory allegations of "personal affinity" are not sufficient to establish director interest). Further, the record shows that Field had sensible business reasons for planning an annual board meeting at Fleming's headquarters. Neither Geiger nor Banks ever objected to the location of these meetings and nothing in the record suggests that meeting once a year at Fleming's headquarters allowed Fleming to dominate or control the actions of the Company's board of directors.[22] Similarly, legitimate business reasons caused Field to consult with Fleming about acquisition possibilities because ABCO would have looked to Fleming as a principal source of financing for such transactions. Finally, the fact that Field stated that a Fleming/ABCO combination "makes perfectly logical sense" does not evidence his control by Fleming. Fleming was ABCO's largest stockholder, largest supplier and (by the time of the foreclosure sale) its only secured creditor. It is hardly surprising that a knowledgeable observer would see the logic in the combination of Fleming and ABCO.[23]

In contrast, Fleming's payment of $24,000 per year for Field's service as its board designee requires further analysis. Fleming continued to pay Field that sum after he became ABCO's Chairman (1991) and CEO (1992), management positions for which he was compensated by ABCO. ABCO was not, of course, a publicly held company. The composition of its board of directors was governed by an agreement among stockholders that gave both Fleming and the Noteholders the right to designate board members. In the circumstances, it is unremarkable that Fleming

assumed the responsibility to compensate its own board designee for his board service, or that it continued to do so after he became a member of ABCO's management.

In the circumstances, I find that the annual $24,000 stipend is not so great as to give rise to an inference of impropriety. *See Steiner v. Meyerson,* Del. Ch., C.A. No. 13139, Allen, C., 1995 WL 441999, mem. op. at 15–16 *7, (July 18, 1995) ("There is, of course, no single template for how corporations should be governed and no single compensation scheme for corporate directors; amount alone is not the most salient aspect of director compensation, but certainly $100,000 a year or more would not be inappropriate where board service was demanding ...."); *Good v. Texaco, Inc.,* Del. Ch., Cons.C.A. No. 7501, Brown, C., 1985 WL 11536, *14, mem. op. at 32–33 (Feb. 19, 1985) (noting that even where directors' compensation appears substantial to the average layman, directors are not necessarily dependent on such fees where they are well-to-do in their own right). I am unable to conclude that Field's receipt of this annual stipend, alone or considered in conjunction with the other facts of record, subjected him to Fleming's domination or control.

### d. Other factors

■ Ultimately, the trial record does not support Plaintiffs' contention that Fleming used its position as ABCO's largest stockholder to stymie ABCO's search for capital. Rather, the record shows that ABCO's inability to raise new capital resulted from the failure of ABCO's various constituencies to agree on a plan to recompose or restructure the rights arising out of the 1992 Restructuring and held by

---

**22.** Hill testified that as a favor to Fleming, one board meeting a year was held in Fleming's headquarters in Oklahoma City, a concession that was made because Fleming's financing and lease guarantees were instrumental to ABCO's continuing operations. ABCO's business plans were customarily presented at this meeting, so it was an

opportunity to involve Fleming executives in discussions regarding ABCO's long-term goals.

**23.** Like Devening, Hill's status as a Fleming designee does not deprive him of his independence. See discussion, *supra,* pp. 408–09.

them under the Stockholders Agreement, the Certificate of Incorporation and, in Fleming's case, the Supply Agreement and its loans to ABCO.

Fleming agreed to the decision by ABCO to retain investment-banking advice in 1995. Fleming did not choose either Furman Selz or TCC, and the record does not support the inference that Fleming fired either of them. The Furman Selz proposal failed because Fleming was unwilling to give up its Supply Agreement for nothing. TCC's proposal would also have required significant and disproportionate self-sacrifice by Fleming. In addition to suffering material dilution of its equity interest, Fleming was called upon (i) to provide additional vendor credit, (ii) to defer principal payments on the Fleming Loan, (iii) to guarantee new store leases for ABCO, and (iv) to subordinate its debt. Fleming was under no obligation to agree to any of these things, either as a stockholder, a supplier or a creditor. *See Jedwab v. MGM Grand Hotels, Inc.*, Del. Ch., 509 A.2d 584, 598 (1986) (finding that Delaware law "does not ... require ... controlling shareholders sacrifice their own financial interest in the enterprise for the sake of the corporation or its minority shareholders."). Fleming's refusal to waive its preemptive rights or to assume further financial obligations on behalf of ABCO without adequate compensation cannot seriously be thought to have been a breach of its fiduciary duties. As Chancellor Allen observed in *Thorpe v. CERBCO*, Del. Ch., C.A. No., Allen, C., 1993 WL 443406, *7, mem. op. at 14 (Oct. 29, 1993), "controlling shareholders, while not allowed to use their control over corporate property or processes to exploit the minority, are not required to act altruistically towards them."

In response to TCC's proposal, Fleming proposed an alternative as an acceptable means to restructure ABCO's finances. The terms of that proposal were then negotiated by Banks and others and evolved into the Recapitalization Plan and Rights Offering that ABCO's directors approved unanimously as being in the best interests of the company. If that plan had succeeded, ABCO would have obtained needed financing and averted the consequences of its default on its secured indebtedness. I am unable and unwilling to conclude that Fleming's conduct in this regard evidences its domination and control over ABCO or its board of directors.

The Recapitalization Plan and Rights Offering failed because the minority stockholders chose overwhelmingly: (i) not to participate in the offering through the investment of additional capital; and (ii) not to agree to the proposed changes in the Agreement and the Certificate of Incorporation that were required before Fleming would proceed alone in providing needed financing without minority stockholder participation. There is no question that the minority stockholders' decision to reject the Recapitalization Plan was taken with knowledge of the likely consequences of that rejection. *See In re General Motors Class H Shareholders Litigation*, Del. Ch., 734 A.2d 611, 621 (1999) ("Thus, the [minority] stockholders had a free choice between [choosing to participate in the Rights Offering or not choosing to participate]. The opportunity to make this choice by vote carried with it a concomitant obligation on the part of the voters to accept responsibility for the outcome.").

In short, the dire financial situation confronting ABCO by the middle of November 1995, was no more the result of Fleming's control over the corporation than it was the result of the negative control exercised by the other stockholders. Ironically, ABCO's search for more capital was stymied by the very structures in the Agreement and the Certificate of Incorporation that were intended to protect the stockholders from overreaching by each other or by the board of directors. Fleming was eager to contribute more capital, but the others would not accept its terms. The others wanted the company sold, but Fleming's opposition to a sale and its re-

fusal to surrender the value of the Supply Agreement made that option impracticable or impossible.

## B. Fleming's Dealings as the Majority Shareholder

Plaintiffs also attack Fleming's actions after it exercised its warrant in November 1995 to become the majority stockholder. Plaintiffs argue, "After Fleming exercised the stock warrant to take formal majority control of ABCO with the approval of the ABCO board and contrary to the advice of ABCO's legal counsel, Fleming was indisputably the controlling shareholder of ABCO and therefore required to demonstrate that any subsequent transaction with or involving ABCO was entirely fair to ABCO's remaining shareholders." Plaintiffs contend that Fleming failed to show that two transactions were entirely fair—the purchase of the Chemical Bank loan and the purchase of ABCO's assets at the foreclosure sale.

### 1. Fleming's Purchase of the Chemical Bank Loan

Initially, I note the imprecision of Plaintiffs' ascription to Fleming of a duty of entire fairness in all transactions *with* or *involving* ABCO. Neither the purchase of the Chemical Bank loan nor the acquisition of the ABCO Markets shares in the foreclosure sale was a transaction *with* ABCO, in the ordinary sense. They both *involved* ABCO, but this alone does not implicate the entire fairness standard of review. Generally speaking, that standard is applied only to transactions between a

corporation and its controlling stockholder. *See Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 710 (1983) (where a controlling shareholder stands on both sides of a transaction, "[t]he requirement of fairness is unflinching in its demand" that the controlling stockholder establish the entire fairness of the undertaking "sufficient to pass the test of careful scrutiny by the courts").

In theory, an entire fairness standard of review is appropriate where the controlling stockholder has actually used its power over the corporation "to impair the normal and primary protection the law affords the corporation and its stockholders; the judgment of its independent board of directors." 1 *Rodman Ward, Jr., et al., Folk on the Delaware General Corporation Law* § 151.6, at GCL–V–38 (4th ed.1999). There is no evidence or suggestion in the record that the ABCO board of directors had any occasion to become involved in negotiating the terms of Fleming's deal with Chemical Bank. Nor is there evidence that Fleming used its position as ABCO's largest stockholder to secure terms from Chemical Bank that might not otherwise have been available. Thus, if Fleming had simply purchased the loan from Chemical Bank without seeking ABCO's approval, there is no reason to suppose that Fleming would have owed any fiduciary duties to ABCO or its fellow ABCO stockholders in doing so.[24]

The issue is whether by the mere fact of seeking that approval,[25] Fleming subjected

---

**24.** Plaintiffs do not argue, nor could they, that the sale of the Chemical Bank loan presented a corporate opportunity that Fleming was required first to present to ABCO. ABCO was insolvent and lacked the financial capacity to acquire the Chemical Bank loan itself. Thus, there was no "corporate opportunity" to which it was entitled. *See Balin v. Amerimar Realty Co.,* Del. Ch., C.A. No. 12896, Jacobs, V.C., 1996 WL 684377, *6, mem. op. at 12 (Nov. 15, 1996) (necessary element of corporate opportunity doctrine is that the company be financially able to exploit the opportunity); *see also Broz v. Cellular Info. Sys., Inc.,* Del.

Supr., 673 A.2d 148, 155 (1996) (holding that even a solvent company can be deemed financially incapable of availing itself of a corporate opportunity where it "was not in the position to commit capital to the acquisition of new assets").

**25.** The record does not clearly reveal why Fleming sought that approval. Fleming was advised by its counsel that it did not need the board's approval for the transaction. ABCO's lawyers argued that a supermajority board vote was required under the Stockholders Agreement. Presumably, Fleming sought the

the transaction (or, more likely, the board's approval of it) to an interested party analysis. I am not aware of any authority suggesting this is so, and plaintiffs have cited none to me.

No doubt Fleming had a duty of disclosure to the ABCO board of directors in seeking their approval. *See Kahn v. Tremont Corp.*, Del.Supr., 694 A.2d 422, 431 (1997) ("A controlling shareholder ... must disclose fully all material facts and circumstances surrounding the transaction."). Plaintiffs make no claim that Fleming violated that duty. It is equally true that the directors' decision to approve Fleming's acquisition of the Chemical Bank loan is reviewable under normal fiduciary duty standards. *See generally,* 1 *R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations & Business Organizations* § 4.30, at 4–122 through 4–125 (3d ed.1998) [hereinafter *Delaware Law of Corporations* ] (noting that ordinary and traditional business decisions, such as what investments or ventures to pursue, taken in the absence of self-interest, lack of due care, defensive measures or in the context of a change of control, are generally within the business judgment of the board). This issue will be addressed at Part II.C.1., *infra.* Neither truism, however, leads to the conclusion that Fleming owed a duty of entire fairness to ABCO or ABCO's stockholders in its negotiations with Chemical Bank or in seeking approval of the Chemical Bank transaction from ABCO's directors.

Neither the process by which Fleming negotiated its deal with Chemical Bank nor the terms of the agreement between Fleming and Chemical Bank were relevant to ABCO and its stockholders. Not surprisingly, Plaintiffs have raised no issue about either in this proceeding. The only matter of interest to ABCO was that all of its defaulted, secured indebtedness would, as a consequence of the transaction, be held in the same hands. This result would marginally decrease ABCO's room to maneuver by eliminating the theoretical possibility of negotiating with Chemical Bank to restructure its debt. It would also marginally increase Fleming's powers as a creditor to notice and supervise the foreclosure sale.[26] These considerations appear to have been reviewed with the ABCO board at its November 20, 1995 meeting. They are not the sort of considerations that have ever caused a Delaware court to invoke the entire fairness standard of review. *See Delaware Law of Corporations,* § 4.30, at 4–120 ("The 'entire fairness' test ... is prototypically applied 'where a self-interested corporate fiduciary has set the terms of a transaction and caused its effectuation.").

### 2. Fleming's Purchase of ABCO's Assets at the Foreclosure Sale

Plaintiffs raise similar issues of "entire fairness" in regard to Fleming's bid at the foreclosure sale. Either directly or by inference, plaintiffs argue that: (a) Flem-

---

board of directors' approval to avoid any argument that it was required for some reason.

**26.** Under Arizona law, Fleming had the statutory right, as junior lienor, to foreclose on its position without Chemical Bank's agreement or participation in the process. *See Ariz.Rev. Stat. Ann.* § 47–9504(A) (West 1998) ("A secured party after default may sell, lease, or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing."). However, the sale of the collateral at such a foreclosure sale would have been made subject to Chemical Bank's first lien. *See Midyett v. Rennat Properties,* Ariz. Ct.App., 171 Ariz. 492, 831 P.2d 868, 870 (1992) (cit-

ing *Mid–Kansas Federal Sav. and Loan v. Dynamic Dev. Corp.,* Ariz.Supr., 167 Ariz. 122, 804 P.2d 1310, 1318 (1991) ("[T]he purchaser at a foreclosure sale of a junior lien takes subject to all senior liens.")). Alternatively, Chemical Bank could also have foreclosed on its interest, in which case it would have been entitled, as senior lienor, to control the mechanics of the foreclosure. *See Ariz.Rev.Stat. Ann.* § 47–9504 (secured creditor whose loan has been defaulted on controls the specifications of the foreclosure sale, providing they are commercially reasonable). Thus, Fleming gained some advantage by owning the entire secured debt position.

ing had a fiduciary obligation to pay a fair price at the foreclosure sale, (b) in that connection, Fleming had a duty to disclose to ABCO's board of directors its analyses of ABCO's value, and (c) Fleming had an extra-statutory duty of fairness to ABCO in its conduct and organization of the foreclosure process.

### a. Fair Price and Duty to Disclose

█ I will address the first two of plaintiffs' contentions together. I do that because if there is no duty to bid or pay a fair price there can be no correlative duty to disclose information bearing on the fairness of the price paid.

Plaintiffs rely principally on *Weinberger v. U.O.P., Inc.*, Del.Supr., 457 A.2d 701, 708–12, a case involving a parent-subsidiary cash-out merger in which the parent did have a duty of entire fairness to the subsidiary's minority shareholders. The Supreme Court found that the parent did not satisfy that duty because it did not disclose to the subsidiary's outside directors a feasibility study prepared by two parent company designees on the subsidiary's board of directors indicating that even a price 15% higher than the parent was offering for the subsidiary's remaining shares was financially attractive to the parent. *Id.* at 708–10. The Supreme Court held that the study should have been disclosed to the outside directors of the subsidiary because the two conflicted directors who prepared the study (using information obtained from the subsidiary) participated in the subsidiary board's consideration of the merger proposal. *Id.* at 710. The Supreme Court predicated its holding on the following conclusion:

> [I]ndividuals who act in a dual capacity as directors of two corporations, one of whom is parent and the other subsidiary, owe the same duty of good management to both corporations, and in the absence of an independent negotiating

structure . . ., or the directors' total abstention from any participation in the matter, this duty is to be exercised in light of what is best for both companies. *Id.* at 710–11.

In this case, the fundamental factual premise of *Weinberger*, *i.e.*, the existence of a negotiated transaction *between* a parent and a subsidiary corporation, is missing.[27] The ABCO foreclosure sale was not a negotiated transaction *between* Fleming and ABCO. With the announcement of its intention to foreclose, Fleming set in motion a statutory process, in which it acted in its creditor capacity. The governing statutory scheme did not require ABCO directors' approval of either the notice of foreclosure or the terms of the winning bid at the foreclosure sale. In the circumstances, I am constrained to find that Fleming did not owe a fiduciary duty to ABCO, or its minority shareholders to bid or pay a "fair price" at the foreclosure sale. *See Solomon v. Pathe Communications*, Del. Ch., C.A. No. 12563, Allen, C., 1995 WL 250374, *5, mem. op. at 14–15 (Apr. 21, 1995), *aff'd*, Del.Supr., 672 A.2d 35 (1996), where Chancellor Allen stated:

> In the present case, [the majority stockholder], as a security holder of the 98.5% of [the company's] stock was legally entitled to commence foreclosure proceedings upon default by [the company]. Even if the consequences of that foreclosure were, for example, to render the value of the minority . . . stock worthless, the secured creditor would have no obligation to forego or delay exercising its legal rights as a creditor. A controlling shareholder is not required to give up legal rights that it clearly possesses; this is certainly so when those legal rights arise in a non-stockholder capacity.

Mem. op. at 14, 1995 WL 250374 at *5 (citations omitted).

---

27. It also bears noting that the memoranda in question were prepared after the November 20, 1995 meeting of the board of directors, in connection with Fleming's analysis of its bidding strategy at the foreclosure sale.

In an earlier opinion in this case denying defendants' motion to dismiss the complaint, Chancellor Allen found that Fleming was not constrained by fiduciary duties when acting as a creditor in relation to the foreclosure sale. *See Odyssey Partners, L.P. v. Fleming Co.*, Del. Ch., C.A. No. 14770, Allen, C., 1996 WL 422377, *3, mem. op. at 6–8 (July 24, 1996). Chancellor Allen stated:

> [F]iduciary obligation does not require self-sacrifice. More particularly, it does not necessarily impress its special limitation on legal powers held by one otherwise under a fiduciary duty, when such collateral legal powers do not derive from the circumstances or conditions giving rise to the fiduciary obligation in the first instance. Thus one who may be both a creditor and a fiduciary (*e.g .,* a director or controlling shareholder) does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditor rights.

Mem. op. at 6–7, 1996 WL 422377 at *3 (citations omitted). I defer to this finding as the law of the case. *Odyssey Partners v. Fleming Co.*, Del. Ch., Lamb, V.C., 1998 WL 155543, *2, let. op. at 4 (Mar. 26, 1998) ("To the extent the Opinion expresses the view that Fleming's mere status as a fiduciary did not impose on it extra-statutory obligations in the conduct of the foreclosure sale, I recognize that expression as a correct statement of Delaware law."); *see also Zirn v. VLI Corp.*, Del. Ch., C.A. No. 9488, Allen, C., 1994 WL 548938, *2, let. op. at 5 (Sept. 23, 1994) (setting out law of the case doctrine); *Frank G.W. v. Carol M. W.*, Del.Supr., 457 A.2d 715, 718 (1983) (same). In my view, this rationale applies with equal force both to the claim that Fleming was obligated to pay a fair price in the foreclosure sale and that it (or Lawson) was obliged to disclose to ABCO's directors its analyses of ABCO's value to

it. Fleming was not acting in a fiduciary capacity when it bid at the foreclosure sale and, thus, its conduct thereat is not subject to a fiduciary duty analysis.

### b. Fleming's Alleged Orchestration

 The foregoing conclusions also doom plaintiffs' claim that Fleming violated its fiduciary duties by the manner in which it "orchestrated" the foreclosure sale.[28] Fleming's rights to control the foreclosure sale were statutory rights derived from its status as a secured creditor. Since these rights did not derive from any fiduciary relationship, the law will not impress upon them special limitations that pertain to the conduct of fiduciaries. *See Odyssey Partners, L.P.*, Del. Ch., C.A. No. 14770, Allen, C., 1996 WL 422377, *3, mem. op. at 6–8.

I recognize that this rationale would not extend to actions taken by Fleming, as majority stockholder, to prevent the board of directors from acting to protect ABCO or its stockholders from the "threat" posed by the notice of foreclosure. But, no such action has been alleged with any specificity, and the record ultimately does not support a conclusion that any action or decision of the ABCO board of directors taken or not taken in response to Fleming's notice of foreclosure was the product of Fleming's domination or control.

### C. The Alleged Breach of Duty by the Defendant Directors

Plaintiffs' final argument is that the defendant directors breached their fiduciary duties owed to the plaintiffs in that they did "absolutely nothing to attempt to ensure that ABCO would be sold for the highest possible price after it became apparent that it would be sold." Plaintiffs' argument focuses on the failure of the defendant directors to either (1) put ABCO

---

**28.** Plaintiffs complain that Fleming gave the minimum amount of notice, gave it over the Christmas and New Year holiday season, required confidentiality agreements to be signed, refused to execute those agreements until just four days prior to the sale, and required interested parties to review the information on site instead of sending it in the mail.

in bankruptcy or (2) if not, (a) to negotiate with Fleming for some value for the minority shareholders or (b) at least, to maximize ABCO's value at the foreclosure sale by contacting potential purchasers. In light of the exculpatory provision found in Article Eighth of ABCO's certificate of incorporation, I find it necessary to analyze these matters only in the context of plaintiffs' allegations of breach of the duties of loyalty or good faith.

These claims require me to consider whether the conduct of the ABCO directors on and after November 20, 1995 is appropriately evaluated under the standard recognized in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173, 182 (1986). They also require me to consider the effect of ABCO's insolvency on the duties of the directors to the ABCO creditors, stockholders and the corporate enterprise.

### 1. Revlon Does Not Apply

■ Under *Revlon*, once the sale of a corporation is inevitable, the duty of the board of directors changes from the preservation of the company as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit. *Paramount Communications, Inc. v. Time Inc.*, Del.Supr., 571 A.2d 1140, 1150 (1990); *Revlon*, Del.Supr., 506 A.2d at 182. As later interpreted by the Supreme Court in *Arnold v. Society for Savings Bancorp, Inc.*, *Revlon* duties apply and:

> The directors of a corporation 'have the obligation of acting reasonably to seek the transaction offering the best value reasonably available to the stockholders,' *Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 43 (1994), in at least ... three scenarios: (1) when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company; (2) where, in response to a bidder's offer, a target abandons its long term strategy and seeks an alternative transaction involving a break-up of the company, or (3) when approval of a transaction results in a sale or change of control.

*Del.Supr.*, 650 A.2d 1270, 1289–90 (1994) (second and third internal citations omitted).

■ The special fiduciary duties described in *Revlon* and its progeny never arose in this case because the *ABCO board* did not "initiate an active bidding process," did not "seek an alternative transaction involving a break-up of the company" and did not approve a transaction resulting in "a sale or change of control" of ABCO. *Id.* at 1290. Instead, *Fleming* initiated a statutory process that led to a sale at auction of the ABCO Markets stock owned by ABCO. That process was, as a matter of law, controlled by Fleming, not ABCO. Arizona law neither creates nor recognizes any role in that context for ABCO's board of directors. *See Ariz.Rev.Stat. Ann.* § 47–9504 (*secured creditor* whose loan has been defaulted on controls the specifications of the foreclosure sale, providing they are commercially reasonable) (emphasis added). Moreover, the process did not result in a change in the share ownership or control of ABCO.

■ In these circumstances, plaintiffs' argument that ABCO's directors were subject to *Revlon* duties in responding to the notice of foreclosure lacks a grounding in common sense or reality. Nothing plaintiffs cite supports engrafting *Revlon* duties upon a process initiated by a creditor and that is legally beyond the directors' control. *See Solomon*, Del. Ch., C.A. No. 12563, 1995 WL 250374, *5, mem. op. at 15 (complaint dismissed because no allegation made that the company possessed any rights or claims that it could legitimately use to thwart the foreclosure). *Revlon* duties do not arise where the directors do not have the power to control the terms on which a sale of the company takes place. *Bershad v. Curtiss–Wright Corp.*, Del. Supr., 535 A.2d 840, 845 (1987) (noting

"futility" of directors "assum[ing] the role of auctioneers" where majority stockholder had power to thwart any such efforts).

### 2. The Effect of ABCO's Insolvency

Defendants contend that the actions of ABCO's directors on and after November 20, 1995, were constrained by the duty to protect ABCO's creditors. *See Geyer v. Ingersoll Publications Co.*, Del. Ch., 621 A.2d 784, 787 (1992). In *Geyer*, the Court stated, "the general rule is that directors do not owe creditors duties beyond the relevant contractual terms absent 'special circumstances...e.g.,* fraud, insolvency, or a violation of a statue....'" *Id.* (citation omitted). An insolvent corporation is defined as one that is "unable to pay its debts as they fall due in the usual course of business." *Id.* at 789 (citation omitted). Defendants argue that the instant case falls into one of the "special circumstances" outlined in *Geyer*, since ABCO was insolvent from no later than November 20, 1995 through the time of the foreclosure sale. In *Geyer*, this Court stated, "when the insolvency exception does arise, it creates fiduciary duties for directors for the benefit of creditors. *Id.* at 787.

### a. Was ABCO insolvent?

The first issue posed by this contention is whether ABCO was insolvent. An insolvent corporation is defined as one that is "unable to pay its debts as they fall due in the usual course of business." *Geyer*, Del. Ch., 621 A.2d at 789 (citation omitted). By the time of the November 20, 1995 board meeting, ABCO had met this standard of insolvency. Two months earlier, the company had defaulted on the accelerated loan payment due Chemical Bank and on both its loan obligations and the Supply Agreement with Fleming. Both Chemical Bank and Fleming had given notice of default and both had agreed to refrain from pursuing creditors' remedies only during the pendency of the Recapitalization Plan and

Rights Offering. Plaintiffs, in advocating bankruptcy as the appropriate alternative for ABCO as early as November 20, 1995, implicitly concede that the company was insolvent-in-fact.

### b. The duties of directors of an insolvent corporation

In an early case addressing the fiduciary duties of directors of insolvent corporations, this Court stated:

> An insolvent corporation is civilly dead in the sense that its property may be administered in equity as a trust fund for the benefit of creditors. The fact which creates the trust is the insolvency, and when that fact is established, the trust arises, and the legality of the acts thereafter performed will be decided by very different principles than in the case of solvency.

*Bovay v. H.M. Byllesby & Co.*, Del. Ch., 38 A.2d 808, 813 (1944). In *Geyer*, this Court again addressed this issue, recognizing that while directors normally do not owe creditors fiduciary duties, an exception exists in the case of insolvency that "creates fiduciary duties for directors for the benefit of creditors." Del.Ch., 621 A.2d at 787. In *Geyer*, while analyzing the question of when a duty to creditors arises, the Court commented:

> The existence of the fiduciary duties at the moment of insolvency may cause directors to choose a course of action that best serves the entire corporate enterprise rather than any single group interested in the corporation at a point in time when shareholders' wishes should not be the directors only concern.

*Id.* at 789. *See also Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications. Corp.*, Del. Ch., C.A. No. 12150, Allen, C., 1996 WL 757274, *36, mem. op. at 83–84 n.55 (noting divergence of interests of parties to whom director duties are owed).[29]

**29.** In describing the effect of insolvency on directors' fiduciary duties, Chancellor Allen

stated:

#### c. Were the directors' duties to ABCO's creditors discharged?

By the time of the November 20, 1995 meeting, the directors correctly understood that ABCO was insolvent. It needed cash to continue operating but no stockholder or other person stood ready to provide such funding. The directors learned that Fleming planned to proceed with a foreclosure sale of the assets securing its loan to ABCO. They were also told that Fleming had negotiated a purchase of the Chemical Bank loan and were asked to give their approval to that transaction.

At the beginning of the meeting, the Company's counsel advised the directors of the changed nature of their fiduciary duties in light of ABCO's insolvency, i.e., their duty to take into consideration the interests of creditors as well as those of stockholders in determining whether or not to approve Fleming's acquisition of the Chemical Bank debt for the purpose of foreclosing on it. Geiger expressed his concern about ABCO's ability to meet its obligations to its unsecured creditors pending the foreclosure sale. In response, Lawson, speaking for Fleming, undertook to pay all of ABCO's unsecured debt obligations, regardless of the outcome of the foreclosure sale. This undertaking was, however, conditioned on the agreement of the directors to proceed with the foreclosure sale. In fact, Fleming advanced ABCO many millions of dollars between November 20, 1995 and the date of the foreclosure sale, in order to pay ABCO's unsecured creditors.

This concession by Fleming can be seen to have served a number of interests. First, it protected the interests of ABCO's general creditors. Second, it protected the interests of the stockholders and the corporate enterprise by providing a mechanism to keep ABCO supplied and operating during the interim period leading up to the foreclosure sale. Of course, everyone understood that ABCO would be worth more as an operating concern than not. With this concession in hand, the directors voted to approve the Chemical Bank transaction by a vote of 5 to 1, Banks dissenting.

In all of this, I find no evidence of disloyalty or bad faith to ABCO's stockholders. Indeed, I find from the record before me that most of the directors perceived (correctly) that ABCO's debt load was greater than the fair market value of its assets and that there were, as a practical matter, no viable alternatives to the threatened foreclosure.

Plaintiffs specifically complain that the board's failure to undertake a "substantive discussion of the pros and cons of ABCO filing for Chapter 11" evidences the defendants' disloyalty or lack of good faith.[30] In support of its allegations, plaintiffs point to several factors: (1) although bankruptcy was raised at the November 20, 1995 board meeting in the context of challenging Fleming's exercise of its warrant, only a brief discussion was held, (2) Hill ignored the advice of ABCO's lawyer who recommended that ABCO file

> But if we consider the community of interest that the corporation represents it seems apparent that [one alternative is better than others]. But that result will not be reached by a director who thinks he owes duties directly to shareholders only. It will be reached by directors who are capable of conceiving of the corporation as a legal and economic entity. Such directors will recognize that in managing the business affairs of a solvent corporation in the vicinity of insolvency, circumstances may arise when the right (both the efficient and the fair) course to follow for the corporation may diverge from the choice that the stockhold-

> ers (or the creditors, or the employees, or any single group interested in the corporation) would make if given the opportunity to act.
>
> Credit Lyonnais, Del. Ch., C.A. No. 12150, 1991 WL 277613, *36, mem. op. at 84 n.55.

**30.** Plaintiffs also charge that the failure to file for bankruptcy law protection violated the directors' Revlon duties. In light of my conclusion that the special duties recognized in Revlon did not arise in this case, I do not address this argument.

for bankruptcy to undo the exercise of the warrant, (3) at the December 13, 1995 meeting, when Banks moved that the company declare bankruptcy, only summary discussion was held and no director seconded the motion. Together, plaintiffs contend, these factors evidence that "the option of bankruptcy was not diligently considered or discussed." [31]

I disagree. I find that the record evidences significantly more discussion and consideration than that cited by plaintiffs. Although the board did not formally discuss the option of bankruptcy until the November 20, 1995 board meeting, it was clearly an option that the directors were exploring, as evidenced by Field and Hill's private meeting with ABCO's corporate counsel and two outside bankruptcy specialists in the weeks prior to the board's meeting. Bankruptcy was not, however, deemed to be a viable alternative. Hill testified, "I saw going into Chapter 11 as liquidating the company. I didn't think it was a viable alternative. I didn't see it as giving us any hope." Hill then explained that his reasoning was based on his experience, stating, "I have been doing this since the 1970's, and [in] retail groceries, because of trade credits and that type of thing, [I] have never seen a bankruptcy where, for example, equity gets any value out of the bankruptcy." Field, Devening and Geiger were all, quite strongly, of the same mind.

The issue of bankruptcy was raised at the November 20, 1995 board meeting. While the record is somewhat unclear on this point, I find that there was discussion about bankruptcy both as a protective alternative for the company and also in the context of challenging Fleming's exercise of its warrant. The meeting was held by telephone, and, at Field's suggestion, both of the bankruptcy specialists participated. When the issue of bankruptcy was raised, Field told the board that "[he] did not think [bankruptcy] would be of any advantage to ABCO and to any shareholder because [he] did not think at that point that ABCO was worth its debt." Hill testified that after the board's discussion, "I felt and the rest of the board seemed to feel ... that [bankruptcy] was not a good alternative because basically we looked at that as liquidation, and that wouldn't protect anybody."

The issue of bankruptcy was again raised at the board's December 13, 1995 meeting, when Banks made a motion that the board file for bankruptcy protection. Devening's testimony was that he did not second the motion "because he felt very strongly that bankruptcy was not an alternative that was in the best interests of all the shareholders for this company at this time." He continued:

> The retail bankruptcies that I have seen in the great majority of the cases result in a complete meltdown, and so there is really nothing of any substance left in terms of the operating consumer equity to the retail chain. And I thought there was a better chance to preserve that and preserve the maximum value for all the shareholders without a bankruptcy.[32]

---

**31.** To the extent this argument is based only on issues of the directors' due care, it is precluded by the exculpatory provisions of Article Eighth of ABCO's certificate of incorporation. Moreover, I note the plaintiffs have expressly denied that any of their claims are for breach of the duty of care.

**32.** The directors were also influenced in their thinking by their awareness of the Megafoods bankruptcy, which took place in Phoenix during the period at issue here. Megafoods was a 70–store Arizona retail grocery chain that filed for bankruptcy in August 1994. The result of the Megafoods bankruptcy was that the company paid $14 million in administrative fees, the company's creditors received less than 10 cents on the dollar and the company's shareholders received nothing. Field testified at trial that his views on bankruptcy were changed because of the Megafoods example, and stated, "They went in. I can't remember the exact number, but I think it cost them $14 million in administrative fees. And that obviously would have been the end of ABCO."

From all of this, I reject the plaintiffs' argument that the directors' failure to pursue the alternative of a bankruptcy filing evidences their disloyalty or bad faith. On the contrary, the record shows that the directors acted properly in considering and rejecting this possible course of action.

Moreover, in arguing that the defendant directors' failure to file for bankruptcy law protection was a violation of the board's fiduciary duties to the stockholders, plaintiffs overlook that the board was obligated to consider and protect interests other than those of the stockholders. When bankruptcy and foreclosure are compared, and the effects of both on the shareholders, creditors and other corporate constituencies balanced, the decision to proceed with the foreclosure cannot be said to have been made in bad faith or a manner that was disloyal to ABCO, taken as a whole. Moreover, the record is clear that the directors, with the possible exception of Banks, reasonably believed that a bankruptcy filing would produce negative returns for all of the ABCO constituencies, including its stockholders.

## D. Valuation Issues

█ Because I find no liability in this matter, I have no occasion to assess damages.[33] Nevertheless, I must address valuation issues because my conclusions about liability are influenced by my conclusion that ABCO's debts exceeded the fair market value of its assets during the relevant period (November 1995—January 1996). As I will explain, *infra*, I reached this conclusion after examining relevant evidence of value, including the results of the foreclosure sale, the opinions of management and the expert valuation evidence introduced at trial.

### 1. Results of the 1996 Foreclosure Sale

The first fact to consider is that ABCO's assets were sold at a public auction. Notice of that sale was given to those persons most likely to be interested in bidding. Adequate information from which to value ABCO was supplied to those who expressed interest in seeing it. In addition, the plaintiffs, all of whom were sophisticated investors and at least one of whom actively participated in the grocery store market from time to time, knew of the sale, had access to information in the Rights Offering and, singly or together, had the resources to bid. Yet none of them bid or encouraged anyone else to bid. Instead, Fleming's "credit bid" was the only one made. In the circumstances, the results of the bidding provide some (but not conclusive [34]) evidence that the fair

---

**33.** I do observe that there is a significant difference between valuing ABCO and the proper measure of damages for plaintiffs in matters of this sort. Plaintiffs were (or are) minority stockholders of ABCO Holding. They chose to proceed in this matter individually, rather than derivatively on behalf of ABCO Holding, because they allege that they suffered "special injury" as a result of the conduct challenged in this matter. In an earlier opinion, I held that they were entitled to do so, in reliance on *In re Tri-Star Pictures, Inc. Litig.*, Del.Supr., 634 A.2d 319, 330 (1993). Their alleged "special injury" was the usurpation by Fleming of 100% of the value of their shares. It follows that proof of their damages depends on proof of the value of their ABCO Holding stock.

At trial, plaintiffs' expert testified as to the fair market value of ABCO Markets. He did not value ABCO Holding or its common stock. Because ABCO Holdings was a non-

public, closely held corporation with a majority stockholder, proof of the fair market value of its assets does not translate directly into proof of the value of a share of its common stock in plaintiffs' hands. In a sense, plaintiffs attempted to prove the *quantum* of damages suffered by ABCO that might have been recoverable in a derivative action, not the value of the "special injury" allegedly suffered by them.

**34.** While I will accord weight to the foreclosure sale as proof that the fair market value of ABCO's equity was not greater than zero, I will also look to other indicia of value because it is not reasonable to infer from the circumstances of this case that the foreclosure sale was conducted in a manner designed to maximize the amount bid. On the contrary, there is ample evidence in the record that Fleming sought to conduct the foreclosure sale so as to maximize its opportunity to win. More gen-

market value of ABCO did not exceed the amount of Fleming's credit bid.

Although they do not challenge Fleming's compliance with statutory requirements, plaintiffs do argue that Fleming managed the foreclosure sale to advantage itself in bidding, by giving too little notice and delaying unreasonably in making available to interested parties confidential information needed to formulate a competing bid. In weighing these complaints, however, it is striking that plaintiffs have adduced no evidence that any potential bidder was actually deprived of a fair chance to bid at the foreclosure sale or had any interest in bidding higher than Fleming.[35] Among other things, no evidence was submitted from any of the three competitors of ABCO who attended the foreclosure sale but who failed to top Fleming's bid. Thus, while there is evidence that Fleming managed the sale process to advantage itself (rather than to maximize the amount bid), the failure of proof as to whether Fleming's conduct actually produced a lower bid, strongly suggests that it did not.

■ Plaintiffs also argue strenuously that because Fleming authorized Lawson to bid more than the amount of the credit at the foreclosure sale, the amount Fleming actually paid does not reflect ABCO's fair market value. I disagree. As a general matter, the fact that the winning bidder at an auction might have been willing

to bid higher should not make the amount of the winning bid less indicative of fair market value. More particularly, the evidence shows that Fleming's willingness to bid higher was largely based on the fact that its Supply Agreement with ABCO made ABCO more valuable to Fleming and, perhaps, less valuable to others. I note, however, the value inherent in the Supply Agreement belonged to Fleming, not ABCO, and that Fleming was not obliged to share that value with ABCO's minority stockholders.

### 2. The Opinions of the Managing Directors

Hill and Field were ABCO's two most senior managers. They both testified to their opinions that the fair market value of ABCO's assets was not more than ABCO's debts in the period November 1995 to January 1996. Both of these men were quite knowledgeable about the retail grocery business and about the financial condition of ABCO. Each spent his working career in the grocery business, and each had been involved with ABCO, in the capacity of manager and common stockholder, for a number of years. In the circumstances, I accord significant weight to their opinions of ABCO's value. *See Fidanque v. American Maracaibo Co.*, Del. Ch. 92 A.2d 311, 321–22 (1952) (managing directors are deemed qualified, by reason of their relationship with the company, to

erally, foreclosure sales are controlled by creditors who are not charged by the law with an obligation to maximize the value obtained and whose interests may not coincide with that objective. Thus, despite the public nature of the sale in this case, I will not consider its results to be conclusive on the issue of value.

**35.** Plaintiffs called Mr. Brian Kwait, a principal at Odyssey Partners during the relevant time, to testify at trial. Beyond stating that ABCO "appeared to have a lot of value," he presented no evidence that the results of the foreclosure sale did not fairly reflect ABCO Market's fair market value. He did say that Odyssey Partners never considered whether it should participate in the foreclosure sale be-

cause it was not "at that point in time making further investments into the grocery sector." Plaintiffs also called as a witness Mr. Walter J. Barrett, Jr., a high yield bond analyst with Prudential. Barrett testified that in the fall of 1995, ABCO was "in a state of deteriorated performance" and agreed that it "was becoming closer to being in distress." He also confirmed his earlier testimony that other supermarkets in the Phoenix market (to whom notice of the sale was given) were the natural buyers for ABCO. His department determined that they would not be able to bid at the foreclosure sale, due to their investment constraints, and made no effort to interest any other division of Prudential in doing so.

give estimates on the value of that company's worth).

### 3. Opinion of Plaintiffs' Valuation Expert

Plaintiffs called, as their valuation expert, Michael A. Kramer ("Kramer"), a managing director of the investment banking firm of Houlihan Lokey Howard & Zukin. Kramer's opinion was that ABCO Markets had a fair market value of between $11.1 million and $31.1 million, and picked the mid-point ($21.1 million) as the best estimate of ABCO's worth.

There are several reasons why I do not give weight to Kramer's opinion. First, plaintiffs did not ask Kramer to prepare (or to cause his firm to prepare) a written expert valuation report. Instead, they offered his testimony at trial, along with a brief summary of his ultimate conclusions that serves as little more than an *aide-memoire* of his testimony. As a result, it was difficult to assess the reasonableness of the methodologies and assumptions used by Kramer in reaching his valuation conclusion. Second, Kramer based each component of his valuation model on a set of projections that the record shows to be unreliable and unattainable. These were also the most aggressive set of projections in the record. They were prepared by TCC without input from ABCO's senior management and reflect assumptions about ABCO's ability to open new stores and remodel others in the Desert Market format that ABCO's senior managers believed to be unattainable. Third, Kramer did not value ABCO as it existed but rather used a hypothetical capital structure, necessary to provide the capital resources to fund the assumed growth, and "predictive" rather than actual historical earnings numbers. While it is possible that it would be appropriate, methodologically, to perform a valuation analysis in this manner in some case, plaintiffs make no argu-

ment why it is appropriate to do so here. Fourth, Kramer's model substantially underestimated the amount of ABCO's trade debt at $12.5 million. Testimony at trial established that, as of the date of the foreclosure sale, ABCO had $27.5 million in trade indebtedness accruing interest. Finally, while all of these deficiencies are argued by the defendants in their post-trial memorandum, plaintiffs offer no defense of Kramer's opinion in their reply brief. Instead, they seem to abandon Kramer, arguing that "the hypothetical fair market value of the ABCO shares is largely irrelevant. What is relevant is how Fleming valued the shares and how much it would have paid for them." Given the absence of a written report and the state of the record, I am unable and unwilling to give weight to Kramer's valuation opinion.

### 4. Opinion of Defendants' Valuation Expert

Defendants offered the expert valuation testimony of Mr. John Hempstead ("Hempstead"), a Chartered Financial Analyst and an Accredited Senior Appraiser in the American Society of Appraisers. Hempstead is Managing Director of Hempstead & Co., Inc. ("Hempstead & Co."), the entity that prepared the appraisal report from which Hempstead testified. The conclusion stated in Hempstead's testimony was that, as of January 9, 1996, the interest bearing debt of ABCO ($67.0 million) exceeded the fair market value of its invested capital ($34.4 million) by approximately $32.6 million.[36] In concluding that ABCO had a substantial negative equity value, Hempstead performed a guideline (or comparable) company analysis and a discounted cash flow analysis. He did not perform a complete comparable transaction analysis because, he testified, he was unable to identify a suitable group of transactions to which to compare ABCO.

---

**36.** The figures in the written report vary somewhat from these figures, as explained by

Hempstead in his testimony.

Plaintiffs attack Hempstead's work for several reasons. First, they complain that he did not perform the bulk of the analysis himself, but relied on others in his firm and an outside consultant to do most of the analytical work and report preparation. This objection reflects a misunderstanding of the role played by a testifying expert, especially where a detailed written report is prepared. Second, plaintiffs contend that the decision to use five year historical performance in the comparable companies approach "underplayed" the fact that ABCO had performed well in 1994. I disagree. ABCO's superior performance in 1994 was the result of certain labor and rent concessions gained in the 1992 restructuring and due to expire in 1995. It was not more indicative of future performance than earlier year results. Third, plaintiffs take issue with Hempstead's use, for the purposes of his discounted cash flow analysis, of income projections prepared by Fleming, nothing that these were the most conservative of any available set of projections. Moreover, Hempstead effectively revised these projections downward by "slipping" them forward a full year. Predictably, Hempstead's DCF analysis produced sharply lower values than that prepared by Kramer. While I find it unnecessary to resolve this objection, it does cause me to weigh less heavily the results of Hempstead's DCF analysis. Fourth, plaintiffs attack Hempstead's decision to omit a comparable transaction analysis. Evidently, Hempstead & Co. identified a group of transactions in ABCO's industry group for which adequate information was available, but chose not to complete the analysis because they made the judgment that the companies involved in the identified transaction were not sufficiently "comparable" to ABCO in terms of financial health and performance. At trial, Hempstead candidly admitted that the companies involved in the transactions identified were all "much better companies than ABCO," and, therefore, the result of that analysis would have been "misleading". I interpret this to mean that the

results of a comparable transaction analysis would have shown values for ABCO that, in the view of Hempstead & Co. were misleadingly high. In my opinion, it would have been more helpful to have presented the comparable transaction analysis together with a statement of reasons why that analysis should be given little or no weight. The absence of such analysis causes me to discount further Hempstead's conclusions.

### 5. Other Factors

Plaintiffs also point to the TCC analysis, the Rights Offering memorandum and the Furman Selz work product as all indicating a positive equity value for ABCO. The TCC presentation report contains mixed advice, including a discounted cash flow analysis showing ABCO having a negative total equity value. The draft Furman Selz work product contains no valuation information. The Rights Offering memorandum proposed to sell new common shares of ABCO Holding at $20 per share. At best this "valuation" is an indication of what ABCO shares might be worth after the infusion of capital proposed in the failed Recapitalization Plan. I am unable to rely on any of these sources.

Finally, I consider the valuation of ABCO prepared by a Fleming analyst in December 1995. Apart from the special value to Fleming pertaining to the Supply Agreement and related warehousing interests, the December 1995 Fleming analysis shows a range of values (before consideration of debt) of between $47.060 million and $66.400 million. At the time of the January 9, 1996 foreclosure sale, ABCO's total interest bearing debt was approximately $67 million. Thus, even Fleming's analysis supports the conclusion that the fair market value of ABCO's equity was not greater than zero.

### 6. Conclusion

Balancing all of this information, I conclude from the record in this matter, that

ABCO did not have a fair market value materially greater than zero during the period November 1995 to January 1996. Indeed, the evidence of record strongly suggests that its equity value was less than zero.

### III. CONCLUSION

For all of the foregoing reasons, judgment is entered in favor of the defendants on all counts. Costs to the defendants. IT IS SO ORDERED.